IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

VIOLA BELSER, )
)
Plaintiff, )
)
v. ) CIVIL ACTION NO:2:06cv1038WHA
)
PROGRESSIVE HALCYON )
INSURANCE COMPANY, )
)
Defendant. )

**MEMORANDUM BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Comes now the defendant, Progressive Halcyon Insurance Company ("Progressive"), and submits this memorandum of law in support of its motion for summary judgment. Progressive is entitled to summary judgment because it is not liable for breach of contract or bad faith under the facts of this case.

## I. Summary Judgment Standard.

Summary judgment is proper when the evidence presented shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. The moving party must present, in support of its motion, evidence that will be admissible at trial. Rule 56(e) Fed. R. Civ. P. The burden of proof is on the party moving for summary judgment to make a prime facie showing that no genuine issue of material fact exists. *See,* Jordan v. General Motors Corp., 581 So. 2d 835, 836 (Ala. 1991).

If the moving party makes a prime facie showing that no genuine issue of material fact exists, then the burden shifts to the non-moving party to rebut that showing by presenting substantial evidence creating a genuine issue of material fact. *See,* Bass v. SouthTrust Bank of Baldwin Co., 538 So. 2d 794, 797-98 (Ala. 1989). Evidence is "substantial" if it is "of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the facts sought to be proved." *See,* West v. Founders Life Assurance Co. of Fl., 547 So. 2d 870, 871 (Ala. 1989). In the case at bar, if the non-moving party fails to come forward with substantial evidence to rebut this party's showing that no genuine issue of material fact exists, then summary judgment is properly granted in favor of the defendant.

## II. Legal argument.

### A. Progressive is entitled to summary judgment because it used reasonable efforts to investigate Viola Belser's claim and because it had legitimate reasons for its valuation of the claim.

The right of an insurance company to independently evaluate its insured's claim has long been upheld by Alabama courts. Time and again, Alabama courts have defended the insurer's claims decisions where it objectively and rationally analyzes the value of the claim and the claimant's unique circumstances. The tort of bad faith, however, has been reserved only for unusual and patently unreasonable claims decisions. The Supreme Court of Alabama addressed the issue as follows:

> The plaintiff asserting a bad-faith claim bears a heavy burden. To establish a prima facie case of bad-faith failure to pay an insurance claim, a plaintiff must show that the insurer's decision not to pay was without any ground for dispute; in other words, the plaintiff must demonstrate that the insurer had no legal or factual defense to the claim. The insured must eliminate any arguable reason propounded by the insurer for refusing to pay the claim. **A finding of bad faith based upon rejection of the insurer's legal argument should be reserved for extreme cases. The right of an insurer to deny a claim on any arguable legal issue is to be as zealously guarded as the right to decline benefits on any debatable issue of fact**, the test of reasonableness being the same.

Shelter Mutual Insurance Company v. Barton, 822 So. 2d 1149, 1154 (Ala. 2001) (citations omitted) (emphasis added).

In Ex parte Alfa Mutual Ins. Co., 799 So.2d 957, 962 (Ala. 2001), the Alabama Supreme Court provided the following elements comprising the tort of bad faith:

> In order to present a prima facie case of bad faith refusal to pay an insurance claim, the insured must prove: (1) the existence of an insurance contract between the parties, and a breach thereof by the insurer; (2) an intentional refusal to pay the insured's claim; (3) the absence of any reasonably legitimate or arguable reason for refusal; (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason; (5) if the intentional failure to determine the existence of a lawful basis is relied upon, the insured must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to pay the claim.

Ex parte Alfa, 799 So.2d at 962. See also Alpin v. American Security Insurance Co., 568 So.2d 757, 760 (Ala. 1990); National Security Fire & Casualty Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982).

Bad faith failure to pay an insurance claim cannot exist, as a matter of law, where the insurer agrees to pay a claim but offers less than what the insured demands. See Lary v. Valiant Ins. Co, 864 So.2d 1105, 1108 (Ala. Civ. App. 2002). In Lary, the court found that

summary judgment on a bad faith claim was proper where the insurer paid repair costs on two vehicles but disagreed with the insured, Lary, as to the vehicles' actual cash value. Lary, 864 So.2d 1105, 1108 (Ala. Civ. App. 2002).

When Valiant appraised the actual cash value of the vehicles for less than Lary's own estimate, Lary filed suit for bad faith and breach of contract. In affirming summary judgment, the court addressed the issue as follows: "The evidence before the trial court showed that Valiant did not refuse to pay a claim filed by Lary . . . This alone negates the first element of bad faith." Id.

There is no dispute that Progressive offered to pay Viola Belser's ("Belser") claim. (See Deposition of Larry David Lackey p. 96). Moreover, Belser never made a specific demand for her claim during her contact with Progressive. (See Deposition of Viola Belser p. 78).

Progressive made a cognitive review of the Belser's UM claim. It discussed the claim with Belser, obtained the police report, and obtained medical records. Blue Cross/ Blue Shield's subrogation claim was confirmed to be in the amount of $7,537. (See Answer; See also Deposition of Larry David Lackey pp. 15-134).

Progressive determined there were legitimate and compelling issues concerning the nature and extent of the Belser's alleged injuries, yet nonetheless offered to settle the claim for $11,505.88. (See Deposition of Larry David Lackey p. 96).

Thus, identical to the issue presented in Lary, the dispute in this case now centers on the insurer's valuation of a claim and not its refusal to pay.  Therefore, summary judgment on Belser's bad faith failure to pay the claim is due to be granted as Progressive has, in fact, made an offer of settlement to Belser.  The mere fact that Belser disputes Progressive's valuation of the claim does not provide a basis for maintaining an action for bad faith or breach of contract.

**B.    Progressive is entitled to summary judgment because there are legitimate and arguable reasons for its evaluation of the claim and Progressive acted reasonably in making its claim determination.**

Even if the holding in Lary is ignored and a dispute over valuation of a claim can constitute bad faith failure to pay, summary judgment is still proper in this case because Progressive acted reasonably in making its claims determination.

In order to recover for bad faith, Belser must show that Progressive denied coverage without any legitimate or arguable reason.  The Alabama Supreme Court has elaborated on this standard as follows:

> In short, a plaintiff must go beyond a mere showing of nonpayment and prove a bad faith nonpayment, a nonpayment without any reasonable ground for dispute.  Or, stated differently, the plaintiff must show that the insurance company had no legal or factual defense to the insurance claim.

Morton v. Allstate Ins. Co., 486 So.2d 1263, 1268 (Ala. 1986).  **If any one of the insurer's reasons for denying benefits is at least arguable, the court need to look no further; a claim for bad faith will not lie.**  Adams v. Auto-Owners Insurance Company, 655 So.2d 969, 971 (Ala.1995) (emphasis added).

First, it should again be noted Progressive did not deny payment on Belser's claim. Moreover, Progressive's reasons for its evaluation of Belser's claim were more than merely "arguable." They were prudent and compelling.

Diagnostic testing reports of Belser's neck obtained immediately after this accident indicated Belser demonstrated degenerative disc disease in the neck which was described by one of Belser's treating physicians, Dr. Julio Rios, as a non-acute condition. (See Deposition of Larry David Lackey pp. 61-65). As a result, Progressive reasonably determined that Belser's condition likely preexisted this accident. (See Deposition of Larry David Lackey pp. 63-72).

Belser's medical bills submitted to Progressive at the time it evaluated Belser's claim amounted to $8,505.88. (See Deposition of Larry David Lackey p. 17).

Even still, it should be noted that Belser's medical expenses have been covered by Blue Cross/Blue Shield of Alabama, which is only asserting a subrogation claim in the amount of $7,377.11. (See Deposition of Larry David Lackey pp. 16-17).

It is undisputed that Belser failed to provide any documentation concerning any lost wages she claimed as a result of this accident (See Deposition of Viola Belser pp. 75-76). Belser has also wholly failed to calculate or submit her out-of-pocket expenses. (See Deposition of Viola Belser p. 39).

Belser's groundless allegations fail to establish that Progressive either unreasonably denied payment of her claim or failed to investigate its merits. Summary judgment is proper because Progressive has demonstrated that there is an absence of evidence to support Belser's

claim. See Bass, 538 So.2d at 797-98. In light of substantial evidence that Progressive thoroughly reviewed the facts of this accident as well as Belser's medical records and damages, Progressive acted reasonably in its claim decision.

Similarly, given Progressive's extensive review of the facts of this accident and Belser's medical records, bills, and alleged out-of-pocket expenses, it is clear Progressive did not fail to investigate the merits of Belser's claim. Belser has offered no evidence, much less substantial evidence, to rebut Progressive's arguments. Therefore, summary judgment is proper, and Belser's claim against Progressive for bad faith and breach of contract are due to be dismissed.

Moreover, Belser has failed to establish the extent of her damages which she claims she received in this accident. Alabama law is unequivocal that not only must the plaintiff demonstrate liability of the tortfeasors is fixed, but she must also establish the extent of her damages is also fixed. See Pontius v. State Farm Mut. Auto. Ins. Co., 915 So.2d 557, 561 (Ala. 2005). Without a showing of both, no breach of contract or bad faith claims against Progressive may be maintained.

Belser's own testimony is that she is still currently undergoing treatment for injuries she attributes to this accident. (See Deposition of Viola Belser p. 79). As a result, Belser's damages are not fixed and no claim for bad faith or breach of contract may be maintained.

Belser has failed to demonstrate that the damages claimed in this case are attributable to this accident.

## C.    Conclusion

It is clear under binding Alabama law that Belser absolutely cannot recover for breach of contract or bad faith. Progressive thoroughly reviewed the facts of this accident and Belser's claim, including medical records, bills, and expenses. It reached a reasonable and fair calculation concerning the value of Belser's claim. Moreover, Belser has wholly failed to demonstrate that her damages are fixed or were even attributable to this accident and not the result of preexisting, degenerative disc disease.

Despite Progressive's thorough investigation of Belser's claim, it offered to settle Belser's claim for $11,505.88.

Progressive acted well within its rights to evaluate the claim value in a fair and reasonable manner. The plaintiff has produced no substantial evidence suggesting either that Progressive unreasonably evaluated the claim or that Progressive failed to ascertain the claim's true value.

WHEREFORE Progressive respectfully requests that this court to grant its motion for summary judgment and dismiss all counts of the plaintiff's complaint for breach of contract and bad faith.

/S/ R. Larry Bradford
R. Larry Bradford, Attorney
for Defendant, Progressive Halcyon
Insurance Company
Attorney Bar Code: BRA039

/S/ Jereme C. Logan
Jereme C. Logan, Attorney for Defendant,
Progressive Halcyon Insurance Company
Attorney Bar Code: LOG017

OF COUNSEL:

Bradford & Sears, P.C.
2020 Canyon Road, Suite 100
Birmingham, AL 35216
(205)871-7733

**CERTIFICATE OF SERVICE**

I hereby certify that I have this the 17th day of July, 2007, served a copy of the foregoing to all attorneys of record by filing the same electronically to addresses as follows:

Jerry M. Blevins, Esq.
Law Office of Jerry M. Blevins
Hillwood Office Center
2800 Zelda Road, Suite 200-3
Montgomery, AL 36106

/S/ R. Larry Bradford
OF COUNSEL

# Deposition of Viola Belser

COPY

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

VIOLA BELSER,

Plaintiff,

vs. CASE NO. 2:06-cv1038-MHT

PROGRESSIVE DIRECT,
et cet.,

Defendant.

* * * * * * * * * * * *

DEPOSITION OF VIOLA BELSER, taken pursuant to stipulation and agreement before Mallory M. Johnson, Court Reporter and Commissioner for the State of Alabama at Large, in the Offices of Dunn King & Associates, 2800 Zelda Road, Suite 100-2, Montgomery, Alabama, on Friday, April 6, 2007, commencing at approximately 12:44 p.m.

* * * * * * * * * * * *

Progressive about settlement other than that one phone call?

A. No.

Q. Have you ever made any settlement demands to Progressive?

A. No.

Q. And as I understand it, you didn't -- did you reject the offer, or did you just say I can't do it now until I finish my treatment?

A. I told him that I was still undergoing treatment and we have to talk about that when I finished.

Q. Okay. And you still haven't finished, have you?

A. No.

Q. And so you still can't decide what's fair, can you?

A. No.

Q. So has Progressive ever denied your claim?

A. What do you mean?

Q. Have they ever refused to honor your claim or pay you, offer you some money?

A. I didn't ever think we had gotten to that

Q. You have to make a deductible or copay, I guess.

A. Right.

Q. Do you know how much your copays are?

A. $15 per visit after you meet your deductible.

Q. What's your deductible?

A. I think it's like $250 per family member.

Q. Do you have a judgment, Ms. Belser, how much you were out of pocket that you paid for your copays and deductibles?

A. No.

Q. Would it be under $500 for your medical treatment?

A. That I've already incurred?

Q. That you've actually wrote checks or that you actually paid.

A. That pertains to the accident?

Q. Yes, ma'am.

A. No. Because some of my missed wages, some of my physical therapy, I had to do after work. And some of them charged like $15 per visit, and some of them just didn't charge the copay

point.

Q. That's what I say, too, but in your judgment --

A. What do you mean refuse my claim?

Q. Have they ever said, we're not going to pay your claim?

A. No. No.

Q. Okay. What it is, is that they made you an initial offer and you said I can't take it or I can't deny it because I'm still going to treatment.

A. Right.

Q. And I want to take care of my treatment before I consider settlement.

A. Right.

Q. And that's where it stands right now, isn't it?

A. Right.

Q. And you're still going through treatment, right?

A. Right.

Q. Do you think Progressive mistreated you in any way?

he had it from June '05 to September '06, when your lawyer got involved. When Donald Lewis had the claim during that little over a year, did you discuss your claim with anybody from Progressive other than Mr. Lewis?

A. Not that I know of.

Q. Okay. Do you remember --

A. I don't remember him.

Q. I was going to ask you that next. Do you remember anybody that you talked to?

A. No.

Q. Do you remember ever making any settlement demand to settle your claim?

A. No. I remember somebody calling me like in July or so, and they -- and they told me --

Q. Was it July '06?

A. I think so. And they told me -- we got to talking about my missed -- missed wages thing. They told me, said the most we can offer you -- I believe they said $3,000 and your medical or something like that. And then I said, well, I know you sent me my missed wages form. They said, you didn't get

it to us. I said, I know because at the time, I wasn't finished with it; so was I supposed to send it in to you before my treatment was up? And I said I was scheduled to go in to see a doctor. And they told me, said, well, you go ahead and take care of that and get back with us when your treatment is finished. And I said okay.

Q. That was a polite conversation?

A. Very.

Q. Have all your communications with Progressive been polite? You've been polite to them; they've been polite to you?

A. Uh-huh. Yes. Very.

Q. That's what I understand from Progressive as well. And so when they made you an initial offer, you just said, I can't do anything right now because I'm still treating?

A. Right.

Q. And they said, go ahead and take care of your treatment and we'll get back together?

A. Right. Right.

Q. And --

# Deposition of
# Larry David Lackey

COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION


VIOLA BELSER,

        Plaintiff,

vs.                  CASE NO. 2:06-cv1038-MHT

PROGRESSIVE DIRECT,
et cet.,

        Defendant.




        * * * * * * * * * * *

        DEPOSITION OF LARRY DAVID LACKEY, taken

pursuant to stipulation and agreement before

Mallory M. Johnson, Court Reporter and

Commissioner for the State of Alabama at Large,

in the Offices of Dunn, King & Associates,

2800 Zelda Road, Suite 100-2, Montgomery,

Alabama, on Friday, April 6, 2007, commencing at

approximately 9:55 a.m.

        * * * * * * * * * * *

APPEARANCES

FOR THE PLAINTIFF:

Mr. Jerry M. Blevins
LAW OFFICE OF JERRY BLEVINS
2800 Zelda Road, Suite 200-3
Montgomery, Alabama 36106

FOR THE DEFENDANT:

Mr. Larry Bradford
BRADFORD & SEARS
Attorneys at Law
200 Canyon Road, Suite 100
Birmingham, Alabama 35216

ALSO PRESENT:

Mr. Lenzie Gill
Ms. Viola Belser

* * * * * * * * * * *

EXAMINATION INDEX

LARRY DAVID LACKEY
BY MR. BLEVINS 4

EXHIBIT INDEX

PLAINTIFF'S EXHIBITS:

1 Document entitled, In Person Contact with Injured Persons --

* * * * * * * * * * *

STIPULATIONS

It is hereby stipulated and agreed by and between counsel representing the parties that

the deposition of LARRY DAVID LACKEY is taken pursuant to the Federal Rules of Civil Procedure and that said deposition may be taken before Mallory M. Johnson, Court Reporter and Commissioner for the State of Alabama at Large, without the formality of a commission; that objections to questions other than objections as to the form of the questions need not be made at this time but may be reserved for a ruling at such time as the deposition may be offered in evidence or used for any other purpose as provided for by the Federal Rules of Civil Procedure.

It is further stipulated and agreed by and between counsel representing the parties in this case that said deposition may be introduced at the trial of this case or used in any manner by either party hereto provided for by the Federal Rules of Civil Procedure.

* * * * * * * * * * *

LARRY DAVID LACKEY

The witness, having first been duly sworn to speak the truth, the whole truth and nothing but the truth, testified as follows:

EXAMINATION

BY MR. BLEVINS:

Q. Okay. Sir, would you state your name for me, please.

A. Larry David Lackey.

Q. And where are you employed?

A. Progressive Insurance.

Q. And what is your position there?

A. I am a claims attorney.

Q. Okay. And where is your office located?

A. It's Birmingham, Alabama, on Riverchase Parkway.

Q. Okay. And as claims attorney, what are your duties?

A. I do several different things. Part of my job entails a training piece in which I will provide training to claims personnel. The second part is to act as a resource for claims management in the state of Alabama and

to provide input to claims management. And I also directly handle a body of cases, which includes first party, noncontract -- or extra-contractual types of cases against the company, and also cases that are large with regard to the expected value of the case. If it's expected to be more than, say, a quarter million dollars or more, then that may come to me.

Q. Okay. And did you tell me your address for your office?

A. It's 2100 Riverchase Parkway. And we have a suite number, but I think that the post offices don't use that anymore. It's Birmingham. I don't know the zip off the top of my head.

Q. Okay. And how long have you been a claims attorney for Progressive?

A. I am terrible with dates. I'll just say that from the outset. I'm really bad with dates. But I have been an attorney since 1995; and I believe my job title as claims attorney is about five years, something like that.

Q. And how long have you been with Progressive?
A. February was 20 years.
Q. Okay. And before you were a claims attorney, what were you?
A. I have held several different titles at Progressive; but immediately prior to being a claims attorney, I was the state litigation manager.
Q. And were you a licensed attorney in that capacity?
A. Only for -- I think -- I think the entire time, I was an attorney.
Q. Okay.
A. But -- but maybe not.
Q. Have you ever been an adjuster before?
A. Yes, sir.
Q. All right. For Progressive?
A. Yes.
Q. And how long were you an adjuster for Progressive?
A. I think that it's -- I think it's fair to say that the entire 20 years, I've been an adjuster because I do the same job duties

that an adjuster does, just maybe at a little higher level. But as the actual job title, really all the way up until I was state litigation manager.

Q. Okay. And have you had experience before with adjusting automobile accident claims?

A. Yes, sir.

Q. And about how many years' experience do you have in that?

A. The entire time, 20 years.

MR. BRADFORD: Progressive doesn't sell homeowner's here.

MR. BLEVINS: Okay.

Q. So Progressive just simply does automobile coverage in Alabama?

A. Well, we do automobile. We do recreational vehicle, motor home, travel trailer, boats.

MR. BRADFORD: Motorcycles.

A. Yes, motorcycles.

Q. All right. And with respect to Ms. Belser's claim that we're here about today, what has been your involvement with respect to that claim?

A. The claim was transferred to me after this lawsuit was filed.
Q. Okay. You didn't have any involvement with it prior to the lawsuit being filed?
A. No, I don't think so.
Q. Okay. And it's my understanding you're here today testifying as the corporate representative for Progressive; is that right?
A. Yes, sir.
Q. Okay. I sent a deposition notice out identifying certain areas I wanted to talk with you about. Are you knowledgeable in those areas?
A. Yes, sir, I believe so.
Q. And you brought some documents with you today?
A. Right.
MR. BRADFORD: It's no new documents other than -- we've already produced just recently the claim file, the face sheet notes, and the policies. What he's got today

is a couple of excerpts from the standards you were asking, claims standards. And we've got those as new documents. Everything else, you've already gotten.

MR. BLEVINS: Okay. Could I take a quick look at those? Was it policy standards, whatever, for processing UM claims?

MR. BRADFORD: Yeah. It's not simply UM, but it relates to UM. And that's '05.

A. Let me show you real quick. There's that document that discusses in person contact, and then this has to do with handling of injury claims, but it begins here. This first part is about medical claims in that paragraph there.

MR. BLEVINS: Can I mark this -- I will mark this as Plaintiff's Exhibit #1.

MR. BRADFORD: Jerry, you asked, I think, for the period from '04 to

'06. And I've got '02 in my car. And I think they're all pretty much the same. It's sort of a dynamic thing. But that's kind of what it would be. And if we take a break, I'll go check and make sure it's nothing different than that.

MR. BLEVINS: Okay. So Plaintiff's Exhibit #1 is four pages. And we'll check on the other during a break, you say?

MR. BRADFORD: Yes.

MR. BLEVINS: Okay. And I'll read over that during a break.

Q. I guess let me just ask you some basic questions. I think we've possibly dealt with these issues in paper discovery; but since we're here, let me just ask you a few sort of factual questions. Does Progressive acknowledge that Ms. Belser was in an auto accident on October the 6th, 2004?

A. Yes.

Q. Does Progressive acknowledge that Ms. Belser was rear-ended in that auto accident?

A. Yes.

Q. Does Progressive acknowledge that a lady named Tashima Hall was at fault in causing that auto accident?

A. Yes.

Q. And does Progressive acknowledge that Tashima Hall was an uninsured motorist on the date of the accident?

A. All of the information that we have indicates that she is. I can't say definitively yes or no because we were never able to talk to her in the claims department. I think that someone in our subrogation department had one conversation, but that was not discussed, but everything that we have indicates that she's uninsured.

Q. Was Ms. Belser's claim handled with a conclusion that Tashima Hall was uninsured?

A. We were adjusting the claim with the intention of paying an uninsured motorist claim.

Q. Okay.
A. If that answers your question
Q. Well, as of today, is there any question in your mind as to whether Ms. Belser had a valid UM claim?
A. We are not disputing that she was uninsured, if that's what you're asking.
Q. Okay. So for today's purposes, we can accept as a fact that Tashima Hall was uninsured with respect to Ms. Belser's claim?
A. I don't know definitively that she doesn't have insurance; but, again, all the evidence indicates she doesn't. And we're not disputing that she's uninsured.
Q. Okay. Now, with respect to policies that Ms. Belser had in place or was an insured on at the time of the accident, it's my understanding there were two policies issued by Progressive that provided UM coverage. Would that be correct?
A. Yes, sir.
Q. One was an automobile policy, correct?
A. Yes.

Q. And one was a recreational vehicle policy?
A. Motor home, yes.
Q. Okay. And to your knowledge, there are no other policies in which Ms. Belser would be an insured for UM purposes on policies issued by Progressive?
A. Well, to my knowledge, there are not.
Q. Before today, have you conducted a search or inquiry to see if there were any other policies?
A. I have not. There --
MR. BRADFORD: Progressive did do that. They did a search to try to find if there were any other policies, and I think that's when the RV policy was discovered. And they did a search and didn't find any other policies.
A. That's correct, but I personally did not.
Q. Okay. And it's my understanding on the auto policy, there's policy limits for a UM claim such as -- or Ms. Belser's UM claim of 50,000 bodily injury. Would that be correct?

MR. BRADFORD: Look at our interrogatory answers. Is that what you're coming off of? I've got the actual certified policies here in my car, but look at --

A. That's correct. I mean, I know she has 50,000 in payable limits.

MR. BRADFORD: I guess it's our response to the request for admissions that would lay out a policy number and limits.

MR. BLEVINS: Yeah. And that's fine. I think some of this may be redundant to paper discovery.

Q. Would it also be true that the motor vehicle policy that we've talked about had a UM policy limit of 20,000?

A. The motor home?

Q. Right.

A. It did.

Q. All right. So on Ms. Belser's claim, the maximum recoverable on policies that we know have been issued by Progressive would have

been 70,000 on the UM claim?
A. For a single person, yes.
Q. Okay.
MR. BRADFORD: It makes it easy when we agree with everything for you.
MR. BLEVINS: Oh, yeah. Yeah.
Q. Let's see. Now, with respect to the October 6th, 2004, accident, does Progressive acknowledge that Ms. Belser sustained property damage in that accident?
A. Yes.
Q. Okay. And does Progressive also acknowledge that Ms. Belser sustained bodily injury in that accident?
A. Yes.
Q. With respect to the medical care received by Ms. Belser, does Progressive acknowledge that the bill submitted by all health care providers totaled $15,252.70?
A. No.
Q. Okay. And you understood my question to say the bill submitted by the medical provider, not what BlueCross and BlueShield paid?

A. I understand. I know that the amount of medical bills that Progressive had in their possession at the time that Progressive evaluated the claim and extended a settlement offer was significantly less than that. If she's had subsequent treatment, perhaps you produced some bills in discovery that I have not yet seen. That may very well be possible.

Q. Okay. Let me show you a document and see if I maybe misunderstood what was produced to me. I'm looking at the documents produced responsive to the request for production Bates number 165 through 168. And that appears to be an itemized listing of bills submitted by health care providers. Can you tell me if you recognize that document?

A. I recognize the document as being in the claim file, but I'm not sure what this is.

Q. Okay. Would you look at Bates number 168 and see what the total is reflected as on that document?

A. It shows benefits provided 7377.11, and it

shows submitted charges 15,252.70.

Q. Okay. Now, are you familiar with that type document?

A. I'm not sure what the document is. I don't know.

Q. Okay. So that document is in Progressive's claim file, but you're uncertain as to what it is. Is that your testimony?

A. Yes. It -- it appears that it may be a document provided by her health insurance carrier.

Q. Okay. Well, what was Ms. Belser's total medical bills on the day that Progressive made this offer we're here about today?

A. The total medical bills were 8505.88. And of that amount, we show that BlueCross and BlueShield have paid 7537.31.

Q. Okay. So your testimony is based upon the claim file, the total bills submitted by all health care providers as of the date Progressive made the offer of settlement total $8,505.88?

A. Yes.

Q. Okay. And what are you looking at there that indicates that?

A. I'm looking at the face sheet notes from the claim file. And this is one that was entered by the claim representative, Donald Lewis.

Q. Okay.

MR. BRADFORD: Be sure and give a date on that.

A. That is 7/7/06.

Q. Okay. And so based upon the review of the claim file, would you be surprised if you learned the actual medical bills totaled in excess of $15,000?

MR. BRADFORD: Object to the form.

A. I don't know that I would be surprised, but that would just mean that there's other medical bills that we didn't have.

Q. Okay. The medical -- the records that y'all have turned over to me that were in your possession --

(Brief interruption)

Q. Okay. Would you be surprised if you learned that the medical bills for the records that

Progressive had in its possession on the date the offer of settlement was made totaled in excess of $15,000?

A. That would not reflect my review of the file.

Q. Would that surprise you if you learned that that was a fact?

MR. BRADFORD: Object to the form.

A. Can you repeat that? Would it surprise me if --

Q. Would you be surprised if that was a fact, that the medical bills for the records Progressive had in its possession on the date the offer of settlement was made totaled in excess of $15,000?

A. Well, if that was a fact, then -- then we would have made a mistake in what was in this face sheet note about the medical bills incurred.

Q. Okay. And how would that possible mistake have affected the processing of the claim, if at all?

A. Well, we would have -- if there were bills that were in excess of what was considered

here, then, you know, it would materially affect the evaluation of the claim. We would need to get, you know, copies of those bills and find out what that treatment was for and amend our evaluation.

Q. Okay. Let me ask you another question on the documents we've looked at earlier, Bates number 164 to 168, and ask you if you agree with this or not. When I look at this document and I look at the health care providers and the charges for services, it seems to indicate health care providers that rendered services to Ms. Belser from October 6th, '04, beginning with Haynes Ambulance, through April 7th, 2005, with a Dr. Kirkland, do you recognize these doctors and health care providers as people that rendered medical care to Ms. Belser on this claim?

A. Some of them, yes.

Q. Okay. And this total down here that we went over, the 15,252, appears to indicate to me, that's the total medical bills for these health care providers. Does that not seem to

indicate that to you?

MR. BRADFORD: Submitted charges.

MR. BLEVINS: Right.

A. It shows submitted charges for the health care providers that are on that document, yes.

Q. Okay. And it is your testimony you don't know if these health care providers are the providers included in the medical records y'all recently turned over?

A. I do not know if the treatments that are reflected on that document are all for treatment of injuries sustained in this accident. If that's -- is a document from her health care provider, then all it's going to show is, you know, providers, the amount that they billed for, and a service date. It's not going to tell you what that was for.

Q. Okay.

A. I mean, some of -- something in the middle of that perhaps, just as an example, could be a doctor visit for something totally unrelated to the accident and you wouldn't know.

Q. Does this appear to be, from your experience, a record that came from BlueCross and BlueShield?

A. I don't know. It doesn't say BlueCross and BlueShield on it.

Q. Do y'all have somebody identified as 07100 as a requester?

A. We do not.

Q. Okay. So looking at this document itself, this would be like the first time you've ever seen a document of this nature with respect to a claim at Progressive?

A. I can't say that. You know, I've reviewed thousands of claims in my -- in my work history at Progressive. I may have come across a document that looks like that before, but I don't remember.

Q. It's my understanding that Ms. Belser's uninsured motorist claim was received by Progressive on October 7th, 2004. Would that be correct?

A. Yes.

Q. Okay. Would you describe the process for me

for the processing of a UM claim from the time it's received?
A. Just what the normal --
Q. Just your normal process.
A. From the time that it's received, then Progressive is going to assign the claim to a claims adjuster, who will undertake many different tasks. And among those would be making sure that coverage is in order, investigating liability, determining what the damages are, including estimating the damage on the automobile, and collecting medical bills, evaluating the -- any injury claim determining if subrogation is in order and, if so, then referring that to our subrogation department, and ultimately settling the claim if it's possible to do so.
Q. Okay. So let me see if I can read my notes now. When you say determine if coverage is in order, would that mean to determine if an insured submitting the UM claim had coverage under the UM provisions of his or her policy?
A. Yes. Sometimes claims are reported where,

for instance, the policy has been canceled prior to the loss. Things like that happen. So the adjuster needs to verify that coverage is in order and that it applies to this particular claim.

Q. Okay. And I believe you said next was determine liability?

A. Yes.

Q. On a UM claim, that would be, what, determining the liability of the at-fault party?

A. Yes. And also determining if your insured was contributorily negligent or if there would be any tort defense to the UM claim.

Q. Okay. Now, you mentioned also determine damages. That was your third one, I believe.

A. Yes.

Q. All right. Well, what does that mean?

A. Well, with regard to the property damage it would mean going out, writing an estimate, securing an agreed repair price on the vehicle and reaching some agreement with an appropriate body shop to repair the car and

then making payment for those repairs. If, for example, an insured has rental reimbursement coverage, then securing a rental while the car is being repaired, making payment for that.

And then with regard to injury claims, it would mean investigating all aspects of the damages, collecting medical bills, collecting medical records, examining things such as the nature of the injury, all of the different variables that would go into evaluating an injury claim.

Q. Is injury to an insured called bodily injury? Is that what y'all refer to it as at Progressive?

A. Bodily injury, uninsured motorist.

Q. Okay. Now, normally when Progressive receives a UM claim and the insured claims to have suffered bodily injury in the accident, what type things are covered under the heading of bodily injury?

MR. BRADFORD: Type of damages?

MR. BLEVINS: Yeah. Type of damages.

A. With regard to a UM claim?

Q. Yeah.

A. With regard to a UM claim, an insurance company basically steps into the shoes of the tortfeasor. So what happens is the insurance company owes to their own insured what the person who's responsible for the accident is legally obligated to pay to that person. For example, if a -- let's say that an uninsured motorist is drunk and hits someone who is insured with Progressive. Progressive would owe compensatory damages to their own insured to compensate them for things such as their medical bills, their out-of-pocket expenses, their intangible type damages, such as pain and suffering. And then because that person was drunk, then Progressive would also owe punitive damages, which are designed to punish or to make an example of the person who was guilty of the bad conduct.

So the insurance company basically takes on the persona of the person who caused the accident and owes whatever that person is

legally obligated to pay.

Q. Okay. So when Progressive is then processing a UM claim for bodily injury, is it true one of the things that an adjuster is going to look at would be since there's physical injury, whether there's any pain and suffering; if so, the extent of the pain and suffering?

A. Yes.

Q. All right. And the same for mental anguish?

A. Yes.

Q. Okay. And is that something an adjuster would routinely start looking at immediately upon receipt of a claim?

A. They would begin to collect information, and they would begin to evaluate and consider those types of things, but there is not an evaluation until the adjuster is -- and, well, the injured person is ready to settle the claim and the adjuster is ready to make an offer on the claim.

Q. Okay. Then you mentioned later on in the things you've listed for me that an attempt

is made to settle the claim.

A. Exactly.

Q. All right. When, generally, is that attempt made?

A. It depends. Every case is different; every case is unique and has to be evaluated and handled based on its own merits. So there's not a static model of we will extend an offer of settlement -- evaluate a claim and extend an offer of settlement at X point. Every case is just a little bit different. You have -- because all people are different and every accident is different in some way. So, often it's going to depend on the injured person, what they want to do.

There are many people who are involved in an accident and, for an example, want to settle their claim immediately, weren't hurt very bad, may have gone to the doctor to be checked out one time, feel like they're fine, want to settle it right then. Other people who have had the same experience may not want to settle their claim for quite a while

because they want to wait and make sure that there's nothing wrong. So there is no static here's how it's done every time.

Q. Okay. Generally speaking, if an insured making a UM claim does not approach Progressive about settling the claim, generally speaking, when would Progressive bring that issue up?

A. Progressive will -- will have an in-person meeting with our insured, if it's possible to do so. That's part of our program. Allows to meet with people -- we like to deal with people face to face. So -- and that's like an initial thing that's done. And in that meeting, the uninsured motorist claim will be discussed. And Progressive's adjuster can many times gauge by that meeting what the insured wants to do.

If -- the way that you've asked me the question, I think you're saying if the insured doesn't come in to you saying, hey, settle my claim. Then Progressive is proactive. They make -- the adjusters will

make phone calls to get in touch with the person to see how they're doing, follow them through their course of treatment. And if the adjuster is receiving medical information which indicates that the person has completed treatment or even that the person may be ending or nearing the end of their treatment, possibly at that point, they'll evaluate the claim and extend an offer. But obviously, you know, an insured person doesn't have to accept an offer or doesn't have to settle their claim if they don't want to and we never pressure people to settle claims.

Q. Is there any scenario you can think of where, generally speaking, an adjuster would try to settle with an insured on a UM claim before that person has even finished their medical treatment and assuming the insured doesn't approach Progressive about that?

A. If the adjuster approaches the insured about that, then, sure. I mean, there's -- there are people who would want to settle their claim.

Q. Maybe I didn't ask the question good or didn't understand your answer. If we assume an insured does not approach Progressive about settlement, is there a scenario where the adjuster of Progressive would approach an insured about settling their claim before the insured's medical treatment is even concluded?

A. I'm sure that there are scenarios where that would happen.

Q. What type of scenarios would that be?

A. I can give you an example. Let's say that there's an insured who -- who's having some ongoing treatment. They know that they're going to have two more chiropractic visits. That's what they've agreed to with their chiropractor. They feel like they're going to be okay. They may want to settle the claim then. So we would settle the claim or extend an offer.

Q. Okay. Any other scenarios you can think of?

A. I mean, they're as many and varied as there are people, so --

Q. Would an adjuster of Progressive possibly approach an insured about settling before treatment is even concluded to try and pay an insured less than what they might normally get?
A. Absolutely not.
Q. Okay. So you mean to tell me there's -- there's -- an adjuster's job is not to try to pay an insured the least amount possible?
A. It absolutely is not. If that's what my company did, I wouldn't work there.
Q. So at Progressive, the responsibility of the adjuster is to determine a fair amount based upon information submitted on a claim?
A. Yes.
Q. Okay. We talked about the process once a UM claim comes in, and we got through the point of settling the claim. At some point in the process -- well, let me back up, because I'm assuming some things here. Are you familiar with the term "reserve"?
A. Yes.
Q. Okay. And what does "reserve" mean, setting

up a reserve?

A. A reserve is an amount of money. It's a financial -- it's a financial thing that takes place within the company where an insurance company sets aside an amount of money in anticipation of paying a claim.

Q. And at what point in the process that we just talked about is that done?

A. When the claim is opened. When the feature is identified and that particular feature is opened.

Q. Okay. And who sets up the reserve?

A. The computer system will set an automated reserve at first, but that is adjusted by the claims adjuster. And that's done pretty quick.

Q. And the initial reserve is determined how?

A. Is determined based upon information that we get -- if you're talking about a UM claim, and I assume that you are.

Q. Right.

A. It's based on information that we get from our insured and what we know about the

accident.

Q. Okay. And just to make sure I understood, the computer normally sets up the initial reserve?

A. When the feature is opened. An uninsured motorist claim is a feature. A collision claim is a feature. When a feature is opened up, the computer will generate a reserve; but with regard to an insured motorist claim, the adjuster will then alter the reserve to fit the particular situation.

Q. All right. And the reserve that's automatically set up, does that come from information that's put into the computer or is it a set reserve every time a claim is opened?

A. It's the set reserve. I don't know if it's an average or what is done; but when you're opening a claim, you're opening a feature. You're doing that because you recognize that there is at least a potential that a claim is going to be paid. So immediately when it's opened, a reserve needs to set aside. The

computer system does that. And I'm sure it's based on past history or something like that, but I don't know. Then it's up to the adjuster to adjust that to make it fit the claim.

Q. Okay. I believe the initial reserve that was set up on Ms. Belser's claim was in the amount of $5,000; is that correct?

A. Yes, it is.

Q. Okay. Then -- and just to make sure I understand, the reserve, whatever amount it is, is Progressive's estimate as to what it may likely end up paying out on the claim; is that right?

A. Not necessarily, no.

Q. Okay. Is it an estimate as to what Progressive determines the claim to be worth?

A. No. It's basically a ballpark figure.

Q. Okay. Of what?

A. You take what would be, say, the worst case, reasonable worst case scenario; and based upon that, then you set the financial reserve.

Q. The worst case scenario?

A. The most reasonable worst case scenario. You don't say, for example, someone has a soft tissue injury and what is the worst possible thing that can happen and let's set a reserve based on that. You have to be reasonable in -- in setting that figure.

Q. Okay. So it's not the worst case scenario and it's not the best case scenario; it's somewhere in between?

A. It's really the most reasonable worst case scenario.

Q. When a reserve is set -- and I may have asked you this, but I just want to make sure I understand. When a reserve is set, is the figure that is set by the adjuster -- is that what he anticipates is likely to be paid out on the claim?

A. No, not really. It's the most reasonable worst case scenario.

Q. Okay. But it's not the most reasonable case scenario; it's the most reasonable worst case scenario?

A. Yeah, I think so.

MR. BRADFORD: Sort of like well done.

A. If you think of it in these terms. I know, as an attorney, if you're evaluating a case for trial, then you're probably thinking in terms of, well, we're going to get a jury verdict here and I think that a jury verdict may range from X to Y. Our reserve would probably be Y. Does that make more sense?

Q. Okay. Let's suppose an adjuster determines most reasonable worst case scenario is $200,000 and a policy limit exists of $50,000. What amount would be set aside in reserves for that claim?

A. $50,000.

Q. So the most reasonable worst case scenario is capped at the policy limit?

A. It is, because that's the most that the insurance company could ever pay.

Q. So there would never be a scenario where after evaluating the UM claim, a reserve would be set higher than the policy limit?

A. No, it would not.

Q. Okay.

MR. BRADFORD: How many pages you got?

MR. BLEVINS: Not many.

MR. BRADFORD: I only have one.

Q. Okay. Now, when we talk about the adjuster determining damages, I think we -- you mentioned that the adjuster has to review medical records, bills, and so on, correct?

A. Yes.

Q. Generally speaking, does an adjuster do anything to assess bodily injury other than reviewing the medical records?

A. Yes.

Q. What other things would typically be done?

A. Well, as I said earlier -- I hate to sound like a broken record, but every claim is unique, so you've got to look at that particular claim. There are a myriad of factors that could be considered in a claim that would go into an evaluation of what is that claim worth.

Q. Well, now, just on the bodily injury.

A. Yes.

Q. Other than medical -- other than an adjuster reviewing medical records, typically speaking, what would an adjuster look at or do to assist in assessing the bodily injury?

A. Well, as I said, there can be a myriad of factors that they would have to look at in coming up with a figure.

Q. Like what?

A. I can give you some examples if you like.

Q. Okay.

A. The facts of the accident, the severity of the impact, the nature of the injury, the treatment that was rendered, whether or not there's any disfigurement, whether or not the injury is permanent in nature, the amount of the medical bills, the duration of the treatment.

Q. Now, isn't most of what you just mentioned included in the medical records?

A. Well, some of it is. Some of it's not.

Q. Other than -- I mean, from what you just described, would it be true that all the things you just went over would be included

in the police report, typically, and the medical records?

A. Most of it, yes.

Q. Okay. Is there anything you can think of that would be taken into consideration that's not included in the police report and the medical records?

A. Yes.

Q. What other things?

A. Let's say there are witnesses to the accident and you have witnesses who have different accounts of how the accident occurred. You may weigh something like the credibility of those witnesses. Experts.

Q. And I asked a bad question, because we're getting too far afield. Let me do it like this. If we assume that an insured is entitled to recover under the UM claim --

MR. BRADFORD: There's a case of liability.

MR. BLEVINS: Right.

Q. -- when the adjuster is trying to determine and assess the injuries to the insured, just

the injuries, what is the adjuster looking at other than the medical records?

A. What physically are they looking at?

Q. Yeah. I mean, I guess what I'm trying to figure out, it seems like the adjuster can only look at the medical records to determine the extent of the bodily injury. Is there something an adjuster typically looks at as far as the sole issue of the extent of the bodily injury?

A. I think information that you get from the person.

Q. Okay. Which generally is accepted as more credible, information coming from an insured or information included in medical records?

A. I don't know that it's more credible. Sometimes it's much less credible. If you have a person who's a malingerer, pretending to be hurt when they're really not to try and make a big insurance claim, then it would obviously be less credible. So I don't know that credibility really -- I don't think you could say that their testimony is more or

less credible than medical records when you're talking about a generic situation.

Q. Okay. Let me try it like this. If you have medical records that shows somebody was paralyzed as a result of an accident --

A. Right.

Q. -- and the insured says, I don't really feel any effects from the accident, how does that -- how does that work then?

A. Well, the person is either paralyzed or they're not, you know.

Q. Okay. So if a person's complaints coincide with what you're seeing in the medical records, then they're just supporting one another, I take it.

A. Sure.

Q. Is there anything else that you can think of?

MR. BRADFORD: Other than what he's told you.

MR. BLEVINS: Yeah.

A. That an adjuster may look at to evaluate a claim?

Q. Just the bodily injury, the injury done to

the insured physically.

A. And again we're talking about a generic claim, not necessarily this case?

Q. Right. Right.

A. Okay. They may look at things such as whether or not, from the severity of the impact, it makes good common sense that this injury occurred. So it's their causation here.

Q. So, hypothetically speaking, a medical record indicates an injury was caused by an auto accident. The adjuster may look at that independently and disagree with the medical records?

A. Well, an -- an adjuster might look at the damage to a vehicle. And you may have almost a nonevent, where you have a scratch on a bumper, and someone who's saying that, you know, they suffered horrible injuries. And it just doesn't make common sense that that that occurred.

Q. So sometimes an adjuster might take issue with the findings of a medical doctor?

A. I don't know. I'm not saying that. I'm saying that whether or not there is causation there may be questionable. It may be something that you have to ask experts about. But, again, this is a generic case. You asked if there were any other scenarios I could consider. That's just one example. I mean, there are -- there are so many different things that can happen when you're talking about human beings and accidents, that I'm sure there are scenarios that I can't even conceive of sitting here today that might fit the situation. I'm not trying to be difficult at all. I'm just -- I'm trying to answer your question.

Q. Okay. During the processing of a UM claim, does the adjuster normally assign a monetary value to physical pain and suffering?

A. Usually what an adjuster will do is assign a global value to the case. Adjusters want to put a figure on -- a settlement figure on the case, and most often a range will be established. An adjuster may come up with a

range of, say, 1,000 to 1500 dollars, which they feel is a fair settlement range.

Q. Included in that global figure, is there normally some amount factored in for such things as pain and suffering and mental anguish?

A. Yes.

Q. Okay. So the adjuster typically wouldn't give an insured a breakdown of how a figure was arrived at; he would just simply say here's a total sum, which would encompass those things?

A. Yes. And I don't think that that would be done necessarily internally either.

Q. All right. Let me ask you a few questions about Ms. Belser's case in particular.

A. Okay.

Q. And it's my understanding that it's Progressive's position that her injury was not what I refer to in written discovery as severe. Is that Progressive's position?

A. I can't really answer that because severe is so subjective. What does severe really

mean? I'm sure that to Ms. Belser, it was absolutely severe. To me, when I wake up in the morning and my neck hurts, to me, that's severe. So -- you know. And it's just very difficult to answer that honestly because it's a subjective term.

Q. Well, how does Progressive classify injuries when it's working a UM claim? Is there some form of classification as far as no injury to death?

A. We don't categorize injuries. They don't fall into buckets. We don't have A, B, C, D, types of injuries.

Q. Okay. The adjuster that handled Ms. Belser's claim, did the adjuster who made the offer determine that the injury was minor?

A. Again, that's very subjective in nature. I think that if you look at a claim from the standpoint of an insurance adjuster, who deals with claims that vary from someone who has a soft tissue injury that may very certainly cause that person a lot of pain, but that's kind of at the -- one of the

extremes of injury claims that an adjuster sees; and then at the other extreme, someone who is injured to the point of being paralyzed or having lost limbs or died as being the most serious types of claims. And then everything else falls somewhere in between those two. It's a continuum.

So an adjuster might look at someone who has a soft tissue injury claim and say that's a minor injury. Okay? That does not mean that that adjuster is in any way diminishing that person's pain or in any way is not taking it seriously, but they may say that's a minor injury because of the various types of claims that they handle. It would be on the lower end.

Q. Well, was a determination made as to whether Ms. Belser's claim -- whether her injury was minor or not?

A. Give me a second to look through the notes.

Q. Sure.

MR. BRADFORD: Is there a different date that you were referring to?

MR. BLEVINS: No. Really, at any time.

MR. BRADFORD: Okay.

A. There is a face sheet note on September 22nd, 2005, that was entered by Melanie Hunter that says, Reviewed, continued to push for meeting with insured to settle this injury claim, appears it is minor in nature. I think that's the only reference in the file at all to the word "minor," but I'm not sure. If there's another, point it out.

Q. Well, what does that mean to you?

A. I think that what she's saying is that this is a soft tissue type of claim. That's what it appears to be.

Q. Okay. Meaning what?

A. Meaning that, as I explained earlier, on that continuum of types of injury claims that we see, that it's probably more to the lower end than it would be to the higher end where you have more serious injuries, people with broken bones, internal injuries, things like that.

Q. Okay. And this person Melanie, is she an

adjuster?

A. She is no longer -- I think she's -- she's still employed by Progressive, but she's no longer in Alabama. I'm not sure what her title is now.

Q. Was she an adjuster back then when that note was made?

A. I think that she was in some -- I can't tell you exactly what her title was then, but I think that she was in some capacity working with field claims on injuries.

Q. Okay. Do you know why she was making a note here in Ms. Belser's claim when she wasn't the adjuster on it?

A. I'm not sure. I think that she had some oversight responsibility for claims, injury claims, in the field.

Q. She was like a supervisor?

A. I think so, of some -- in some capacity.

Q. Is there a correlation between a injury being deemed minor and a monetary offer of settlement?

A. No. As I said, we don't put claims into

buckets or in certain categories based on some subjective it's minor, it's not minor, it's severe. We don't have those types of categories. We look at each claim individually.

Q. But Melanie referred to this one as minor, didn't she?

A. Yes.

Q. So she put it in a bucket.

A. She says, It appears to be minor in nature.

Q. Is that wording she should not have used, putting it in a classification?

A. I don't think that that wording really has any relevance. I don't think that it -- I don't think it's necessarily good or bad.

Q. Okay. That doesn't indicate to you that Progressive didn't really take Ms. Belser's claim that serious as far as her injury?

A. Oh, absolutely not. We -- we take every claim seriously because what appears in many cases to start out as a minor injury may not be at a later date. You just don't know. And as you see, it says it appears it's minor

in nature.

Q. Okay. Let me back up just a minute. During the process we talked about for the processing of a UM claim, are medical records that are being assessed and reviewed by the adjuster, are they normally sent out for a person in the medical field to review and assess them?

A. No.

Q. That's generally never done?

A. It can be done, but it's infrequent.

Q. Okay. Well, what type scenarios would that normally be done?

A. You know, in the 20 years I've been at Progressive, I can probably count on one hand the cases that I can think of where that was done. It's most often cases where you need an outside opinion from a professional in the medical field to interpret something for you.

Q. And the person who made the offer to Ms. Belser, what was his name? Donald? Do you remember?

MR. BRADFORD: Donald Lewis.

Q. Yeah. Does that ring a bell?
A. Donald Lewis.
Q. Do you know Mr. Lewis?
A. I do not.
Q. Is he a medical doctor?
A. No.
Q. Are the adjusters generally, at Progressive, medical doctors?
A. No.
Q. Do most of the adjusters at Progressive have any training in the health care field?
A. They have training with regard to injury claims. They certainly have experience in evaluating injury claims as well as being able to rely on the experience of other more seasoned people with regard to injury claims; but as far as being trained in the medical field, having any kind of professional certification or degree, no, they do not. Not medical doctors or nurses.
Q. Are most of the adjusters at Progressive college graduates?
A. Yes.

Q. Is that a requirement?

A. No. It's not a requirement. If someone has specialized skills that the company may be looking for in a certain role, then they'll hire someone without a college degree; but by and large, they're all college graduates.

Q. Do you know if Mr. Lewis has?

A. I do not.

Q. So sitting here today, you don't know if he graduated from college or not?

A. I can't answer that.

Q. Is it a requirement that the adjusters graduate from high school?

A. Yes.

Q. All adjusters must have graduated from high school?

A. I can't answer that as a blanket statement either. We may, again, have a specific role that someone has exceptional experience in performing. The thing that comes to mind is if we got -- we have a need for someone who is a heavy property damage specialist. Let's say, as an example, a heavy truck specialist,

someone who can write estimates, evaluate damage on very large trucks. We may hire somebody who doesn't have a college degree or maybe even a high school diploma if they have, you know, done that for 40 years and know it like the back of their hand.

Q. Well, what about assessing or reviewing bodily injury claims?

A. I think that pretty much everybody you find is going to have a high school diploma, and 99.9 percent of them will have a college degree.

Q. Does Progressive send these adjusters working these UM claims with bodily injury involved to training to teach them about different diagnoses and so on that may be assigned by medical personnel?

A. Yes.

Q. Okay. Tell me about that training.

A. There's ongoing training that occurs from the time that a person is hired until they leave the company. I cannot begin to tell you all the training that Progressive has given me

over 20 years. There's no way that I can articulate it because it's so much. It happens all the time.

Q. And this is all the time for adjusters as well?

A. Yes, sir, constantly. But, you know, there are specific classes that they have to go to. They go to a property damage class. They go to a casualty class where they learn most of the things that you're talking about. There are many, many different courses offered throughout the life of their career.

Q. And the objective of the courses is to teach the adjuster how to process a claim or to teach them the intricacies of medical diagnosis and what the diagnosis means and what the injury is?

A. Both of those things.

Q. So they receive some medical training as well, informal type medical training?

A. Well, certainly. Absolutely.

Q. And how often is that training? Is it

yearly?

A. It's ongoing. It's all the time.

Q. Okay. So an adjuster handling bodily injury claims would most likely know what degenerative disk disease is?

A. They most likely would. And if they did not, then they certainly have resources and other people available so that they can know.

Q. Okay. What resources other than asking other people?

A. They have -- to know what degenerative disk disease is?

Q. Things of that nature. I mean, if an adjuster gets a report that somebody has a bulging disk at C4-5, how do they know what that is? Where can they go look?

A. Well, they've had training on, you know, common types of things that we see all the time. And that's one of them. So they have the ongoing training. There's also resources like medical dictionaries. You know, we've got a medical payments unit. We have other people that are resources.

Q. And you've gone through the same training, so I may --

A. I can't tell you that I've gone through the same training that an adjuster today has because I did it 20 years ago, those initial classes.

Q. But if I talked with you about a bulging disk at C4-5, you would know what I'm talking about?

A. I would.

Q. Now, other than the medical dictionaries and training or asking other people, are there any other readily available resources at Progressive for a person to go learn about an injury?

A. I think they have some online kind of resources, which is also, for lack of a better term, encyclopedic.

Q. Okay. Would the substance of this inquiry research be included in the claims file?

A. Not necessarily.

Q. Why wouldn't it be?

A. Because I don't think that it would be

necessary to be included in the claim file. Everything that someone may have accessed to glean knowledge about particular subject matter I don't think is going to be in the claim file.

Q. So if an adjuster went and looked at a medical dictionary to see what degenerative disk disease was, it wouldn't be normal for that person to make a copy of that and put it in the claims file?

A. No.

Q. Might an adjuster not even go look to see what a diagnosis means?

A. If they know what it is and understand it, then there wouldn't be any reason to go look it up.

Q. But if they don't know what is or don't understand it, they should make further inquiry to determine what it is?

A. If it has relevance to the particular case you're looking at, then, yes.

Q. Okay. Do you know how long Mr. Lewis has been with Progressive?

A. I do not.
Q. I mean, as part of your involvement in this case, you haven't looked into Mr. Lewis or his capabilities to assess the claim or anything like that?
A. I have not discussed this particular case with Mr. Lewis.
Q. And you hadn't made any inquiries of anybody looking into his handling of the claim?
A. I have reviewed the claim myself.
Q. Okay. Do I take that to mean you have not made any inquiries about his specific handling of it, whether he looked at any literature, asked questions of anybody or anything of that nature?
A. I have reviewed everything that's contained in the claim file. I have not done anything outside of that.
Q. So, sitting here today, you can't tell me that Mr. Lewis went and sought the assistance from anybody in handling this claim, correct?
A. I can tell you that he had several other people involved in the handling of this

claim.

Q. Did he go and ask for their assistance, or were they just different assigned people to the claim?

A. He wouldn't have to ask for their assistance, because they were involved in the handling and management of claim. He had a team leader, a manager. They were looking at this claim as well. He wouldn't have to go ask them. They're in it.

Q. Okay.

THE WITNESS: Could I get some water?

MR. BLEVINS: Sure. We can take a break.

(Short recess)

Q. All right. Let me sort of jump back to where we were earlier. Now, there were -- in the medical records that Progressive had in its possession at the time the offer of settlement was made by Mr. Lewis, which I have a copy of right here, there were two MRI reports in there. We can look at --

MR. BRADFORD: It is Bates stamped.

MR. BLEVINS: That's all right.

Q. Let's start with the MRI report dated October 14, 2004, which was an MRI scan of the cervical spine. And I'll let you peek at mine. I'll let you look at it.

MR. BRADFORD: If you weren't looking for it, you would find it.

Q. Okay. You got it? October 14th, 2004?

A. Yes, sir.

Q. All right. Now, Progressive acknowledges that this document was in its possession when Mr. Lewis made the offer of settlement that we're here about today, correct?

A. Yes.

Q. Now, what is an MRI? Do you know?

A. Magnetic resonance imaging. It is a diagnostic test.

Q. Okay. And this would -- that information would typically be known by adjusters as well, I would assume.

A. Yes.

Q. Now, if we look down at the opinion which resulted from this MRI of the cervical spine,

it notes degenerative disk disease with disk bulges, correct?

A. Yes.

Q. Okay. Now, before I sit here and ask you all these questions, is it going to be your testimony you don't know how Mr. Lewis interpreted that or what he understood that to mean or how he evaluated that?

A. Yes. I can't get inside his head and tell you what he knew about each of these terms.

Q. Okay. Well, as a claims attorney for Progressive here today as the corporate representative for Progressive, how do you look at that?

A. How do I look at the opinion of this MRI?

Q. Yeah. That statement there that's in this MRI report, degenerative disk disease with disk bulges, means what to you?

A. It means that Ms. Belser suffered from that condition.

Q. Okay. Which means what? Does this indicate she most likely sustained this injury in the accident or that it doesn't or that it

doesn't make any difference one way or the other? What's the importance of this finding in the handling of Ms. Belser's claim?

A. Degenerative changes are -- are something that occurs over time. It's not something that's usually caused or associated with an acute injury or trauma.

Q. Now, who told you that?

A. I know that from my experience.

Q. What experience? Because I would suggest to you that's wrong.

MR. BRADFORD: Well, I object to that because he's right.

Q. From your experience doing what?

A. From my experience as a claims person and attorney and handling injury cases over the last 20 years.

Q. Did Progressive have in its possession any document at the time Mr. Lewis made the offer of settlement that established that Ms. Belser had a degenerative disk condition prior to the date of the accident?

A. No. I don't think that we had any document

referencing any kind of tests or anything pre-accident.

Q. So, it would be Progressive's position that because this says degenerative disk disease that she had been suffering from that problem prior to the accident; is that right?

A. Yes. I believe that -- that she was. Could you give me just a second?

Q. Sure. Sure.

MR. BRADFORD: Do you know what you're looking for?

THE WITNESS: I'm almost there, if you don't mind bearing with me.

A. There's a document that was in the file from Baptist Medical Center. It's a radiological report. It's dated 10/6/04. And it shows as the attending physician Julio Rios. And there are actually three of these. One is of the chest, one is of the cervical spine, and one is of the lumbar spine.

Q. Are you referring to x-rays that were done?

A. Yes, sir.

Q. All right.

A. And the impression of those -- the impression of the radiologist's report with regard to the chest shows no abnormality identified. Of the cervical spine, it shows degenerative changes of the lower cervical spine. And of the lumbar spine, he says nothing acute, minimal degenerative changes, spondylosis of L5. And so we were in possession of those documents prior to the MRI.

Q. What do those documents tell you?

A. Well, I think that they indicate that at the hospital, when she had her initial x-rays, there was recognition of degenerative changes in the spine. And this was the day of the accident. And also an indication from the radiologist that says that there's nothing acute.

Q. And it would be Progressive's contention that this x-ray indicates she had degenerative changes, degenerative disk changes, prior to the accident?

A. Yes.

Q. If a doctor told you the degenerative changes

were caused by the accident, would that surprise you?

MR. BRADFORD: Object to the form.

A. I think that if a doctor were to say that degenerative changes were exacerbated, then that would make sense to me. It would surprise me if a doctor were to say that these degenerative changes that were indicated on those x-rays were caused by the accident and were not preexisting. That would surprise me.

Q. Okay. So you're not aware that degenerative changes can be caused by an accident?

MR. BRADFORD: Object to the form. That's a different question.

MR. BLEVINS: I know.

MR. BRADFORD: Okay.

A. I think that they could precipitate degenerative changes and that they could exacerbate degenerative changes.

Q. They could precipitate degenerative changes. So this x-ray report we just looked at could establish there was a degenerative change

because of the accident, correct?

MR. BRADFORD: Object to the form.

A. I am no medical doctor. I am sitting here today. I don't profess to be. But I believe that what these reports are telling us is that she had this condition pre-existing and possibly this accident exacerbated that condition.

Q. And to your knowledge, that was the assumption of Progressive in the handling of this claim, correct?

A. Yes.

Q. So if you were now to find out that assumption was wrong, would you agree the claim may have been misevaluated?

MR. BRADFORD: Object to the form.

A. Yes. If that assumption were wrong and all of this -- these diagnoses that are indicated in the MRI reports are all caused by the accident, then yes, we would have to reevaluate it.

Q. Did Progressive ask any of Ms. Belser's doctors for an opinion as to whether the

accident caused the degenerative changes?
A. No.
Q. Why not?
A. Because we didn't think that was necessary.
Q. But sitting here today, you don't know if it did or not, correct?
MR. BRADFORD: Object to the form.
A. Sitting here today, I do not believe it did.
Q. Well, why wouldn't y'all just ask the doctor?
A. Because I don't think that was necessary.
Q. Because if it had caused it, y'all would have had to pay out more money, most likely, right?
MR. BRADFORD: Object to form.
A. No, not at all.
Q. That didn't have any bearing on it?
A. Absolutely not.
Q. Let's look back at that MRI report again. The report also notes disk bulges, correct?
A. Yes.
MR. BRADFORD: You talking about the October 14, '04?
MR. BLEVINS: Yeah.

Q. Do you see any significance in that?
A. I'm not sure I understand that question. I mean, obviously, she had bulges, disk bulges.
Q. Did Progressive dispute this was caused by the accident?
MR. BRADFORD: Object to the form.
A. Yes.
Q. And what does Progressive assume caused it?
A. I don't know. A lot of people are walking around today with disk bulges that don't even know it.
Q. But Ms. Belser told Mr. Lewis and the other adjusters during the processing of this claim that she had had no back problems or neck problems before this accident, didn't she?
A. Yes.
Q. So, are you just assuming she might have had bulging disks before the accident?
A. Yes.
Q. Based on what?
A. Because many, many people, including you and I, may have disk bulges that are asymptomatic. It's not unusual whatsoever.

Q. Would it be unusual for a person involved in a rear-end collision to have bulging disks?

MR. BRADFORD: Object to the form.

A. It's not unusual for anyone to have bulging disks, especially of the age that everyone in this room has a -- our disks degenerate over our life span. It's just a natural process.

Q. Would it appear to be a causal connection to you if she had no problems before the accident and shortly after the accident, she was diagnosed with bulging disks and was having pain from it? Do you see any connection?

A. Again, I'm not a doctor, so I can't tell you whether X caused Y. But I will say that it's very, very possible and even likely that if you have pain after an accident and you have disk bulges, that you were -- may have been asymptomatic prior to the accident, you're symptomatic afterward. I don't think that that necessarily means that the accident caused the bulges.

Q. Then why do y'all want the medical records if

you're not going to place any credibility on, really, any of the findings?

MR. BRADFORD: Object to the form.

A. I didn't say that at all.

Q. Well, right now you concluded the two findings in this MRI report in your opinion wasn't even necessarily related to the accident, right?

A. That's correct.

Q. So you've dismissed these two findings as having anything to do with the accident whatsoever?

A. No, not at all.

MR. BRADFORD: Object to the form.

Q. You didn't dismiss these two?

A. No.

Q. So they are related to the accident.

MR. BRADFORD: Object to the form.

A. I didn't say that.

Q. Well, I'm not sure what you're saying, then.

A. What I'm saying is that someone can have disk bulges and be asymptomatic; but after the accident, you can become symptomatic.

Q. So the accident may have caused her pain from pre-existing bulging disks?

A. Yes. You can have pre-existing bulging disks and have no problems, but then you could have a trauma and have neck pain that makes a previously asymptomatic condition symptomatic.

Q. At the time Mr. Lewis made his offer of settlement, did Progressive have in its possession any document establishing that Ms. Belser had bulging disks prior to the date of the accident?

MR. BRADFORD: Something dated prior to the accident?

MR. BLEVINS: Yes.

A. We had the x-ray report that shows that there were no acute findings.

MR. BRADFORD: I think he was asking do you have any documents which predate the date of the accident, any medical records. Is that right, Jerry?

MR. BLEVINS: Right.

A. We did not.
Q. Did Progressive contact any of the treating physicians and ask for an opinion as to whether the accident likely caused the bulging disks?
A. No.
Q. Why not?
A. Didn't feel that that was necessary.
Q. Okay. Do you know -- looking at that same MRI report, do you know what spondylosis is?
A. Yes.
Q. What is that?
A. It is a degenerative condition of a disk.
Q. Okay. And are you aware that that can be caused by such things as a rear-end collision?
MR. BRADFORD: Object to the form.
A. A trauma can precipitate that type of condition, but it's also not unusual or abnormal for someone to have that type of condition and have no trauma whatsoever.
Q. Did Progressive determine that this spondylosis indicated in this report was not

caused by the accident?

A. I can't tell you if that -- if that conclusion was made or not.

Q. Well, isn't that sort of important in evaluating a claim?

A. The adjuster may have considered that and may -- may not have considered that. I don't know, but it is not an uncommon condition.

MR. BLEVINS: And, you know, maybe -- and Larry, tell me if I'm wrong; but I thought as a corporate representative, he was going to testify today as to the handling of the claim, including Mr. Lewis's handling of the claim. Isn't that true?

MR. BRADFORD: Well, under the rule, we have to put up somebody who's knowledgeable about the claim. Larry is knowledgeable about the claim. He's now the file owner. But under the rule, if the corporate rep, if he doesn't know

something, he can point you to someone to ask. If you need to take Mr. -- what's his name?

MR. BLEVINS: Lewis.

MR. BRADFORD: -- Lewis's depo later, I think, if he is still working with us, we can make him available.

MR. BLEVINS: Okay. Let's move on and --

MR. BRADFORD: If you need to come back and depose him -- Lewis -- about what all he considered, you know, we can do that.

MR. BLEVINS: I just thought the corporate rep should be able to answer those questions since he's here on those issues.

MR. BRADFORD: I don't think that's what the rule requires. I think they say you have to have a knowledgeable person and then -- because we just had a big litigation over this. And the

knowledgeable person, if they don't know the answer, all they have to do is be able to refer you to someone that you can do as a follow-up.

But Larry, I mean, he's gone through the whole file and he has trained adjusters.

MR. BLEVINS: Okay. Well, let me just keep going and see. Hopefully, there won't be much more we don't know, but let's just see.

Q. This -- I think it's called uncinate spurring indicated on this MRI report at C3 through C7. You see that?

A. I do.

Q. Do you know what uncinate spurring is?

A. It's basically bone spurs. It's a calcium buildup.

Q. Could that be caused by a rear-end collision such as one Ms. Belser was in?

A. Generally not. It's something that occurs over time. It's not an acute thing.

Q. Okay. And that's -- that testimony is based on what?
A. My knowledge and experience and the fact that my mother had them and had to have them removed several times.
Q. Okay. And did Progressive ask any of the treating physicians, Ms. Belser's treating physicians, whether that was likely to have been caused in the car accident?
A. No.
Q. Why not?
A. Didn't feel that that was necessary.
Q. Would you agree that disk bulge at C3 through C7 is a very serious condition?
A. It may be and it may not. You can have disk bulges and not even know that you have them and it affect your life in no way whatsoever. You can have disk bulges that can be extremely painful, encroaching on a nerve.
Q. Okay. Well, let's say a person is involved in a rear-end accident on October 6th, 2004, and within in a week thereafter, after complaining of pain in the neck and back, has

an MRI done that says bulging disk at C3 through C7. Would that indicate to you that was a rather serious condition that possibly arose from the car accident?

MR. BRADFORD: Object to the form.

A. That the disk bulges possibly arose from the car accident?

Q. Well, yeah, that's part of it.

A. Well, it may be a serious condition, and it may not.

Q. Let's suppose -- go ahead.

A. That's okay.

Q. Let's suppose the doctor says you might need to have surgery for this condition. Would that sort of indicate to you that was a serious condition?

A. I think so.

Q. And surgery was recommended as one of the options for Ms. Belser, wasn't it?

MR. BRADFORD: Object to the form.

A. I'm not sure about that. I know the report that you're talking about, but I can't tell from that report if the doctor is trying to

say that she needs to have surgery. I don't take that away from that report.

Q. So the report we're talking about where the doctor gives Ms. Belser three options, one of them is surgery, you understood that to mean she may not even need surgery but he was giving that to her as an option?

MR. BRADFORD: You're talking about as a result of this accident?

MR. BLEVINS: Well, yeah.

MR. BRADFORD: As opposed to her --

MR. BLEVINS: Yeah.

Q. I mean, the report we're talking about, the doctor was treating her for injuries that she's claimed resulted from this accident, correct?

A. I don't know that the doctor has made any causal connection between the disk bulges and this accident. I know that he had -- in that report, he did offer three options of treatment. And it was, you know, from a very conservative to the most extreme being surgery.

Q. So if the doctor was to walk in this room right now and say, in my opinion, the degenerative disk disease, the bulging disks, were all caused by this accident, would that be something important to you?

A. I think that if the doctor is going to causally relate that to this loss, then, yes, because we would need to reevaluate the case.

Q. Okay. And Progressive does not feel it had an obligation to make that inquiry in evaluating this claim, correct?

A. No, I don't think that that was necessary, not at the point that we were at that time. No one had made that claim, so --

Q. Nobody had made what claim?

A. I don't think anyone was alleging that these bulges and the spondylosis, the spurring, that all these things were causally related by the accident. Nobody had made that claim to us.

Q. Then, why were y'all going to pay the medical bill for it?

A. Because she was receiving treatment for pain that she had resulting from the accident. These conditions appeared to be pre-existing.

Q. So y'all were going to pay these medical bills, although you don't accept these injuries were related to the accident?

MR. BRADFORD: Object to the form.

A. No, that's not what I'm saying at all.

Q. Well, what are you saying? Because you lost me there.

A. I'm saying that it is -- it appears that these things were pre-existing. Now, it may not have caused her any problem. She may have had bulges that caused her no problem prior to this incident. Okay? But she had to go have treatment because she hurt from this accident, so she may have had something that was not symptomatic and after the accident, became symptomatic. So, absolutely, we're going to -- to pay for that, for the injury.

Q. So Progressive acknowledges, at least, whether the conditions existed or not prior

to the date of the accident, that in assessing the claim, the conditions were aggravated by the accident?

A. They may have been, yeah.

Q. Okay. And when you say they may have been, did Progressive accept that in the handling of the claim, that it was aggravated?

A. Well, we certainly know that she was having pain. She was receiving treatment for that pain. So I don't think it's a giant leap to think that it aggravated it, caused it to become symptomatic.

Q. Well, I think it is sort of important in assessing the dollar value of the claim, don't you, whether it was exacerbated or not in the conclusion that Progressive reached on that issue? Don't you agree that's important?

A. Can you ask that question again?

Q. Yeah. Did Progressive accept, in assessing the value of Ms. Belser's claim, that these conditions which Progressive said may have been pre-existing were exacerbated by the car

accident?

A. Well, it was either that or she was having pain in her neck because of just soft tissue injuries that had nothing to do with the pre-existing conditions. It was one or the other. And either way, you know, we're going to owe for that.

Q. So, there was no conclusion reached by Progressive in assessing the value of Ms. Belser's claim as to whether these conditions were exacerbated by the car accident?

A. No. I'm saying that I don't think that it really mattered whether these conditions were exacerbated or if she had this pain not withstanding these conditions. Either way, she was having neck pain and we were going to pay the injury claim. Does that make sense? It doesn't -- I don't think that it made that much difference. We were going to pay for her neck injury.

Q. Well, how do you assess pain and suffering, a monetary value for pain and suffering, if you

don't conclude whether she had pain existing before the accident?

A. She told us she did not, so we accepted that at face value.

Q. Okay. So, after the accident, Progressive accepted the fact she was experiencing pain and discomfort from the accident, correct?

A. Yes. Yes.

Q. All right. Did Progressive accept as a fact she wasn't experiencing any mental anguish prior to -- any abnormal mental anguish prior to the date of the accident in handling the claim?

A. We don't know if there were other factors in her life that may have caused her mental anguish prior to the accident. We don't know that. But yes, I think that the accident could have caused her mental anguish, and the injury that she sustained could have caused her mental anguish, and we did take that into consideration.

Q. Right. In offering the roughly $3,000 above the medical bills, that was taken

into consideration? Is that what you're saying?

A. Well, the offer amount was what it was, but yes.

Q. Well, the medical bills encompass the entire sum of money offered except for roughly $3,000, correct?

A. Well, the medical bills were paid for by a collateral source, so she had BlueCross BlueShield, who had paid those bills. And so to say that the medical bills encompassed everything but the $3,000, we made a global offer that was the amount that it was.

Q. But let me make my point here. The money that Ms. Belser was going to receive in her pocket arising from the accident was about $3,000, correct?

A. Well, it was more than that because she would have received the entire amount of money less the BlueCross subrogation.

Q. And coming up with the offer that was made, it included the subrogation amount of over $7,000 owed to BlueCross, correct?

A. It did except that it's possible also that BlueCross would accept a lesser amount than the full amount that they paid. I don't know that; but that's, as you know, very common. I'm sure every case you settle, you negotiate with the health carrier for a lesser amount of money.

Q. But if BlueCross didn't agree to accept less, they were owed over $7,000, right?

A. Yes.

Q. So that would leave roughly -- if BlueCross said, we want all of our money -- which they had the right to do, correct?

A. They did.

Q. Then Ms. Belser would have been receiving a little over $3,000 or so for pain and suffering and mental anguish, correct?

A. She would have received whatever -- I don't have the figure right in front of me; but whatever the offer was, less the BlueCross subrogation in that case.

Q. And you know that would have been, roughly, a little over $3,000, right?

A. I think it's more over four, but --

Q. And based on your review of the claim, how long did Ms. Belser suffer from pain that was exacerbated by the car accident?

A. Her treatment period was roughly five and a half, six months, somewhere in there.

Q. Well, she was still undergoing treatment when Progressive made its offer, wasn't she?

A. We did not know that, if she was undergoing treatment. We thought that she had concluded treatment.

Q. Doesn't the claim file indicate y'all were aware she was undergoing treatment still when the offer was made?

A. Can you show me what you're talking about in the claim file?

Q. Probably not, but I can try.

MR. BRADFORD: Tell you what. Look at that July -- you're talking about where she responded when they made the offer is what he's talking about.

A. When we made the offer, she told us that she

was still undergoing treatment, that her doctor had told her she may have to have a bone removed from her neck. Prior to that, I believe that we thought that she was through treatment. What I'm looking at is a Capitol City Rehab Plus discharge summary of 4/30/05, which states, Patient states that she's pleased with the outcome of her therapy; she still has occasional soreness, but she's able to perform all her duties.

She was discharged from physical therapy at that time.

Q. Let's look at the claims file. Look at the October 26th, 2005, entry. It says, Donald, keep pushing for meds/settlement. It's about midways down the page there on page 19 of the claims file. You see that entry?

MR. BRADFORD: Do you have a time on that?

MR. BLEVINS: 12 p.m.

A. 10/26?

Q. 10/26/05. You're on page 04.

A. 05? Okay. Yes.

Q. Okay. It says, Donald, keep pushing for meds/settlement, doesn't it?
A. Uh-huh.
Q. Right above that, October 10th, 2005, it indicates that she had gotten a wage form that Progressive had sent her, correct?
A. Yes, she did receive a wage form, although we were not talking to her at that point. We had a lot of trouble communicating because we would call and not get a call back. We would leave messages that we didn't get a call back. And so we went by her residence a few times just to -- what we call a cold call, just drop by to see if somebody is home and we can make contact. And that's what was done there.
Q. And what was the urgency of getting in touch with her?
A. So that we would know what's going on in the -- with her progress and how she's doing.
Q. And why was Progressive so worried about that that they made a cold call on her?
A. Because we want to keep, you know, on top of

the claim. We want to be able to assess reserves, know how she's progressing, if she's ready to settle her case.

Q. Well, what if Ms. Belser just decided she didn't want any money from Progressive and she was done with it and that's why she wasn't getting back with you? Why would y'all be out there knocking on her door trying to get her to speak with you?

A. Because somebody makes a claim, you don't just drop them and forget about them. You want to keep handling the claim until it's concluded. If she didn't want to make a claim, all she -- had she told us that, we would have closed it.

Q. And you didn't understand the fact she wasn't getting back with you to mean she didn't want to speak with y'all at that point?

A. We didn't know why she wasn't getting back with us. That's another reason you go by the house, to find out.

Q. So you mean to tell me if you, as a claims attorney for Progressive, calls somebody

repeatedly and leaves them messages and they don't get back with you, you don't understand that to mean they don't want to talk to you?

A. I do not. I don't know what that means. It could mean that they're sick and in the hospital. I don't know why somebody doesn't call me back.

Q. Well, if they're sick and in the hospital, they want you showing up at their front door?

MR. BRADFORD: Jerry, y'all are just sword fighting. It really doesn't matter, does it?

Q. All right. Let's look at the November 18th, '05, entry. I believe in that entry, Progressive was notified that Ms. Belser was still in treatment, correct?

A. Yes.

Q. And can you tell who made this entry?

A. Donald Lewis.

Q. And in this entry, Mr. Lewis indicated or explained to Ms. Belser he wasn't making any offers until her treatment was finished and all of her bills were in for evaluation,

correct?

A. Yes. That's why I concluded, as I earlier said, that he thought that her treatment was finished.

Q. Well, how could he conclude that if he's got right above that she was still in treatment?

A. I mean before the offer was extended.

Q. Oh, okay. Let's look at page 22, the negotiation plan. You see that?

A. Yes.

Q. What is a negotiation plan?

A. I think that's pretty self-explanatory.

Q. Now, to me, it means try and get the insured to take the least amount possible and if they won't take it, here's what you need to do. That's what it means to me. Is that what it means?

A. No.

Q. What's a negotiation plan?

A. Negotiation plan means here's how we're going to negotiate a settlement based upon the evaluation that we've reached.

Q. Okay. And this plan that y'all put in place

says that Mr. Lewis should begin by offering her her medicals of $8,505.88 plus $3,000 generals, correct?

A. Yes.

Q. That would be the lowest offer that he was authorized to make, correct?

A. That would be the initial offer.

Q. Okay. And this indicated 8,500 plus for medicals, didn't it?

A. It says with meds of 8505.88.

Q. And why 3,000 for generals? What is generals?

A. Well, he's talking about general damages, damages in addition to special damages, which are out-of-pocket damages.

Q. Like pain and suffering?

A. Uh-huh.

Q. Like mental anguish?

A. Yes.

Q. Okay.

A. But you also have to consider that what he's really putting out there is a global offer because that $8,505.88 is not a number that

has to be repaid to anybody. A portion of that would also go to Ms. Belser.

Q. The 8,000 plus doesn't have to be repaid to anybody?

A. No. Because the BlueCross subrogation was much less than that, so that difference there would go to her.

Q. Well, was that just a mistake on Progressive's part or y'all intended to give her some extra money on the medical bills?

A. No. The evaluation was the 8505.88 plus 3,000. That was a global, this is what we're offering to settle the claim. She didn't have to repay all of that.

Q. Look right above that where it says, looks like, Authority request 14,505.

A. That's right.

Q. What does that mean?

A. That would be -- you know, as we've talked about earlier, when a case is evaluated, a range is established. And that would be the top of the range, and that was authorized as the top of the settlement range. When we

evaluate a claim and we're trying to put a dollar figure on what an injury claim is worth, well, this is a very subjective thing. What an injury claim is worth is not something that you can pull out of a book or that you can look at a chart. And we have many, many years of experience in evaluating claims and coming up with what is a fair and reasonable figure for a particular injury, but it's not an exact science. You don't know what that value really is. The only way that you can know what it is, is to have a trial and have a jury tell you what it is. So you don't know with certainty what that value is. Therefore, we develop a settlement range. We have a figure that begins with X amount and ends with Y amount. And we feel like either of those figures or anywhere in between is a fair amount.

Q. And this range you're talking about is based upon -- in Ms. Belser's case was based upon Mr. Lewis's subjective assessment of the severity of her injuries in large part,

wasn't it?

A. Yes.

Q. So if his assessment was wrong, then this range was off to begin with, wasn't it?

A. Yes, it would be. If his assessment is wrong. And, you know, again, it's not an exact science. Sometimes it is wrong. And, you know, that's why, unfortunately, we have to try these cases sometimes; because we could be wrong in our assessment or you could be wrong in yours if you have a higher opinion of what the case is worth.

Q. If Progressive thought 14,505 was a fair sum to pay on the claim, why did they only offer 11,000 something?

A. Because we thought 11,505.88 was a fair settlement as well. As I just explained, we felt like either of those figures or anywhere in between would be a fair amount.

Q. Okay. And, obviously, if you offered the lower one and she took it, Progressive would save some money, right?

A. I don't think of -- I don't think of it in

those terms.

Q. But that's a fact, though, isn't it?

A. No.

Q. If you offered 11 and she took it and you were going to pay 14,000, Progressive didn't save money?

A. We weren't going to pay 14. We were going to pay anywhere between those two figures, because all of those -- all of that seems to be fair. You have to have a low and you have to have a high.

Q. And if Ms. Belser took the lowest offer within that range, Progressive saved money, didn't they?

MR. BRADFORD: Off their --

Q. Off if she had taken something higher within the range.

A. Yes.

Q. So that's the reason you make the offer initially the lowest, at the end of the range, correct?

A. I think that the reason that you make the offer initially at the low end of the range

is, first, because it's a fair amount of money. It's a fair and accurate evaluation of the claim. So you're not out there trying to rip somebody off. The amount that you're offering is fair. But we have established a range because of the reasons I explained earlier. I don't want to -- I don't think that's any reason to be repetitive.

Q. Well, why doesn't Progressive tell the insured when you contact them and say, look, we've established a range of what we think is reasonable; it's between 11,500 and 14,500. Does Progressive tell people that?

A. I don't think that -- you know, I can't say that there aren't adjusters who would tell the insured that, you know, the insurance company has established a range. I don't think that's a normal practice.

Q. Did Mr. Lewis tell Ms. Belser that?

A. No, I don't think so. I don't think that's a normal practice; but, again, the money that's being offered is a fair and reasonable amount of money at the low end of the range. And

many people expect that there will be some negotiation to take place. It's like buying a used car. You expect there will be some give and take in settling the case.

Q. All right. Let me just go back to the other MRI here for a minute and ask you a few questions from that. This is December 1, 2004, MRI report on the lumbosacral spine. Now, you'll note down there under opinion number one, there was that degenerative disk disease again.

A. Yes.

Q. Would your testimony be the same earlier about that condition as it related to the cervical spine?

A. Yes.

Q. And I think the most important thing I got out of that testimony earlier was Progressive believes this might have been a pre-existing condition and possibly the condition was exacerbated by the car accident, correct?

A. Yes.

Q. Would that also be true for the prominent

disk bulges at L4-5 and L5-S1?

MR. BRADFORD: That it could have been pre-existing, but the pain aggravated by the accident?

MR. BLEVINS: Right.

A Yes. I think that's -- I think that's even more prominent given the prior x-ray report that shows that there's nothing acute in the X-rays of the lumbar spine done at the hospital.

Q. And are you aware that an X-ray is not very reliable in comparison to an MRI in looking at these injuries? Are you aware of that?

A. I'm no medical doctor, but I know that an MRI is generally a better test than an X-ray.

Q. And are you familiar with what a bilateral foraminal stenosis is?

A. Yes.

Q. What is that?

A. There are pairs of nerves that exit the spine from the spinal canal and run to different parts of the body. They exit through openings in the spine called foramina.

Foraminal stenosis is a narrowing of the opening through which those nerves penetrate -- or exit the spinal canal.

Q. Okay. And the disk bulges referenced here, are you aware that if one of those disks rupture, that it could sever the spinal column?

MR. BRADFORD: Object to the form.

A. I have never, in my experience, seen or heard of that happening, where a ruptured disk actually severed the spinal cord.

MR. BRADFORD: Did you say cord or column?

MR. BLEVINS: Same thing.

A. I never heard of that occurring. I'm not saying it can't happen. I don't know. But I've never heard of it happening. I know that when a disk ruptures, there's often impingement upon one of the nerves that exits through the foramina. I've never heard of it severing the cord.

Q. Have y'all received training while you've been at Progressive indicating that a

ruptured bulging disk could potentially sever the spinal column?

A. I don't remember ever having any training to that effect, no.

Q. Now, if a doctor was to come in and testify that that is a real possibility with this bulging disk, do you think that might be something you would have wanted to know in handling this claim?

MR. BRADFORD: Object to the form.

A. Well, also assuming -- we're making a lot of assumptions; but also assuming that that bulge was caused by the accident, then, yeah, we would certainly like to know that and would like to know that today so that we can reassess the injury.

Q. Have y'all reassessed the injury since making the 11,000 plus offer?

MR. BRADFORD: I'm going to instruct you not to answer anything that would involve after you filed your lawsuit, after the bad faith lawsuit was filed. But anything

from the time of the original offer up until the bad faith lawsuit, you can answer.

A. Between those time frames, no.

MR. BLEVINS: You know, Larry, I think it's relevant because we may very well have grounds to sue for continued refusal to reevaluate the claim in light of information that's been turned over in this lawsuit. So I think it's relevant.

MR. BRADFORD: I'm just going to instruct him not to answer because anything after the lawsuit is going to have attorney/client involvement, where I'm giving my input to him, what I think the case is worth and things like that, my take on the records, my recommendations. And I don't think that would be fair game.

MR. BLEVINS: I'm not wanting to ask

about anything y'all discussed. I want to ask him about his handling of the claim since the lawsuit was filed, which certainly may involve additional claims being made for failure to reevaluate in light of information they've received since the lawsuit was filed.

MR. BRADFORD: Okay. I hear what you're saying, and I respectfully disagree, and I'm going to instruct him for today not to answer that. I'm not trying to argue with you.

MR. BLEVINS: That's fine.

Q. Mr. Lackey, are you going to refuse to answer those questions?

A. Based on advice of counsel, yes, sir.

Q. All right. Let's see. Does Progressive have a medical person on staff to assist in reviewing such things as these MRI reports we've gone over?

A. No.

Q. And does Progressive have a medical person who it contracts with to review things such as these MRI reports?

A. No.

Q. All right. Let's see. Let me turn to your interrogatory responses that you answered on behalf of Progressive and number 11. In response to an interrogatory, you testified in part that she, being Ms. Belser, apparently only had a soft tissue injury according to the initial medical records. Do you see that testimony?

A. Yes.

Q. Was that your testimony?

A. Yes.

Q. Would you tell me where you -- or what this claim about a soft tissue injury is based on? Where did that come from?

A. From the medical reports.

Q. Which reports?

A. From our review of all the medical reports that were obtained.

Q. Can you point me to any medical report that

indicated Ms. Belser apparently only had a soft tissue injury?

A. The Baptist Health emergency room reports indicate diagnoses which are indicative of soft tissue injuries.

Q. Where are you looking to see that?

A. Clinical impression.

Q. Where it says, Contusion to the head, back, and shoulder?

A. Yes. And strain/sprain of the neck.

Q. Okay.

A. And the -- if you look at the -- again, the X-rays taken at the hospital, which indicate nothing acute, minimal degenerative changes, et cetera.

Q. Anything else that testimony is based on?

A. It's based on all the medical reports and a comprehensive review.

Q. Well, don't the other medical reports indicate she has bulging disks?

A. She has bulging disks which we interpreted to be pre-existing. If there is any medical testimony otherwise, then we'll certainly

take that into account.

Q. And this Baptist record you just looked at indicated problems with C5 and C7 and L5-C5, it looks like, doesn't it, under x-rays?

A. Yes, x-rays were taken of those areas.

Q. And that indicated spondylosis, didn't it?

A. It did.

Q. So, when you say the review of the initial medical records showed only a soft tissue injury, that's not totally truthful, is it?

MR. BRADFORD: Object to the form.

A. It is truthful.

Q. Because you determined everything else was not caused by the accident is why it's truthful?

A. Yes. Based on the medical records that we have, there was nothing that would indicate to us that those were not pre-existing conditions.

Q. Okay. Well, how do you know the soft tissue injury wasn't a pre-existing condition?

A. Because she was asymptomatic and she was having pain.

Q. Well, how do you know she was asymptomatic?

A. She said she was.

Q. Well, she also said she was asymptomatic for degenerative disks and bulging disks, right?

A. She could have those conditions and be unaware of it, as many people are.

Q. She could also have a soft tissue injury and be unaware of it, couldn't she?

A. If it were asymptomatic, I suppose, which is, to me, very unusual.

Q. Okay. But it's not unusual to have bulging disks and be asymptomatic?

A. No, it's not.

Q. Is it true that Progressive simply accepted she had a soft tissue injury because that means Progressive wouldn't have to pay that much money to settle the claim?

A. That's not true.

Q. Okay. Money never comes into play when Progressive is evaluating a claim, does it?

A. Of course it does. That's what an evaluation is. But if you're saying that the intent is to evaluate a claim at an amount that is as

small as possible, no, we don't do that at all.

MR. BLEVINS: Okay. Let's see. Give me just a minute.

MR. BRADFORD: Take your time.

(Brief pause)

Q. All right. Let me ask you this. We talked earlier about a global offer encompassing all damages, correct?

A. That's correct.

Q. Included in this offer that Mr. Lewis made to Ms. Belser, can you tell me how much Progressive factored into that offer for pain and suffering?

MR. BRADFORD: Separately?

MR. BLEVINS: Yeah. Because he testified earlier that is factored in.

A. I don't think there's a separate breakout for pain and suffering, no.

Q. But it would have been factored in that figure, wouldn't it?

A. Yes.

Q. And what amount was factored into that figure for pain and suffering?

A. I just testified it isn't broken out. There was a global amount that included those elements, but it was a global amount. There was no breakdown of this amount is for pain and suffering, this amount is for X or Y.

Q. It's your testimony you cannot tell me how much was included in that sum for pain and suffering?

A. Not as a separate element, no.

Q. You can't tell me how much was factored in to be included in that global offer for pain and suffering?

A. As a separate amount, no.

Q. And the same would be true for mental anguish?

A. Correct.

Q. All right. Is Guy Markham -- is he an adjuster at Progressive?

A. He's a claim representative.

Q. Is there a difference between an adjuster and a representative?

A. No, not really. There's different levels, but there's no difference.

Q. Is an adjuster above a representative?

A. No. It's just job titles.

Q. Was Progressive aware that Ms. -- well, let me ask it this way. Did Ms. Belser notify Progressive prior to Mr. Lewis's offer that she had missed time from work as a result of her injuries?

A. I don't know if she told him that at the initial meeting or not. I know that a wage authorization was provided to her, which was never returned.

Q. Should an adjuster ask at the initial meeting in processing the claim, have you missed any time from work?

A. Well, not necessarily, because that meeting takes place so quickly. I mean, he was there the day after the accident, so it wouldn't make a lot of sense to be asking about that at that point. That's why that offer is provided later, provided at a later time.

Q. What about -- say Mr. Lewis was handling this

claim for two years. Would he be expected to ask if she missed any time from work during that two-year period of time?

A. We would certainly want to know that. And, again, that's why a wage authorization was sent. If there was something missed, we would have expected to hear back about it.

Q. And I would expect the wage authorization would be sent because an insured claimed to have missed time from work; is that right?

A. That's right. Or there may be an expectation that some time would have been missed.

Q. Okay. So sometimes an adjuster sends a wage authorization release form when the insured hasn't even told them they've missed time from work?

A. Yeah, that can happen. You can -- you may send one out, possibly with a letter saying if you missed time, then you need to have your employer fill this out. It can definitely happen.

MR. BLEVINS: Okay. Let me just look through here for just a minute.

(Brief recess)

Q. Okay. Mr. Lackey, I'm looking at page 8 of the claims file. The initial reserve was set at 5,000. And that's the October 18th, '04, entry.

MR. BRADFORD: You got my face sheet notes?

THE WITNESS: There they are.

A. What's the date?

Q. October 18th, '04.

A. Yes.

Q. Okay. Now, can you tell who made that entry? Was that this computer-generated, or was this the adjuster?

A. That is Donithin Messer. Donithin Messer. It's D-O-N-I-T-H-I-N, M-E-S-S-E-R.

Q. And what on here indicates that to you?

A. There is a rep identification code.

Q. Is that the DTM?

A. Yes, sir.

Q. All right.

A. We had to decipher those before we came so I would know who these people are.

Q. Two lines above that comment section, it says, BI negotiation for Belser, Viola. Do you see that?
A. Yes.
Q. All right. Does the reserve at 5,000 apply to the bodily injury? Is that what this entry indicates?
A. That's the UM claim for Ms. Belser. They were setting a $5,000 reserve.
Q. All right. Would that reserve at that time have included medical bills, or is that just for the bodily injury aspects, the pain and suffering, mental anguish?
A. The reserve encompasses the full value of the claim.
Q. Okay.
A. And, again, at that point, we didn't know much of anything about the injury. The reserve is a dynamic thing. It's not static. It's consistently being updated.
Q. And did I understand you to say that Mr. Messer put this figure in here; it wasn't the computer?

A. He did.
Q. All right. And so immediately upon receipt of the claim, the reserve was set at 5,000 with hardly no information about the claim?
A. Right, except that she had a neck injury.
Q. Okay. If you'll turn to page 12, December 20th, 2004, entry about the middle of the page. All right. Do you see the language that, Have over 5,000 in meds, raising reserve to 10,000, which is sort of blocked out?
MR. BRADFORD: I guess you can read through my --
A. Yes.
Q. Okay. Now, Mr. Messer made this entry?
A. He did.
Q. All right. What was Mr. Messer's involvement in this? Was he an adjuster early on?
A. I think that he was the team leader, which is the first layer of management above the adjuster.
Q. And this is one of those instances where I take it he was receiving information about

the claim and, based on the information he was receiving, decided to raise the reserve?

A. Yes.

Q. Okay. What's the correlation between receiving information and making a decision to raise the reserve?

A. It depends on what the information is; but if -- as the information is received, you have to adjust your reserves accordingly. If you receive information, for example, that an injury is more severe than you first thought, you may raise the reserve. If you receive information that an injury is less severe than you first thought, you may lower it.

Q. Can we conclude from this entry that whatever information Mr. Messer had received, he made a determination that the claim was worth more than 5,000 and so the reserves needed to be upped?

A. I don't think you can say at that point that he made a determination that the claim was worth more than 5,000. I think that he's making a determination that it very possibly

is worth more than 5,000. The claim has not been evaluated at that point.

Q. Okay. All right. If you will look at page 15, March 25th, '05, entry. Do you see the language, Leaving reserves at?

A. 10,000.

Q. I would assume that was 10,000 at this time, right?

A. Yes.

Q. That was Mr. Messer making that entry?

A. Yes.

Q. Okay.

MR. BRADFORD: We'll have to get white-out instead of just black it out.

Q. And on that entry, Mr. Messer noted the meds are at $6,000, correct?

A. Yes.

Q. All right. If you'll look at page 17, down near the bottom, under the June 17th, 2005, entry, it says, Review reserve with slash MHH. Do you see that?

A. Yes.

Q. Okay.

MR. BRADFORD: That's the Melanie Hunter that he mentioned earlier.

Q. Okay. And can you deduce from this entry that Ms. Hunter was Mr. Messer's supervisor of sorts at the time of this entry?

A. I don't think she was the supervisor, no. She had some injury process job. I think she may have been over all field injury claims or field litigation claims or some -- some job like that. She wasn't his boss.

Q. And what would be the usual circumstance where a review was called with somebody else of a reserve? When would that typically be done?

A. It can be done in several different circumstances. I'm not sure why they did it in this circumstance or why they felt that they wanted her input.

Q. Okay. Are these notes in this claims file that we're going over, are they notes that document pretty much everything that occurs on a claim, actions taken on a claim?

A. Pretty much, yes.
Q. Anything of any significance would be documented in these notes?
A. Yes.
Q. And I take it one of the reasons for documenting in these notes would be for future reference if needed, correct?
A. Certainly.
Q. Now, when I read through these notes, I didn't see any indication that anybody assigned to this claim or working on this claim referred to any medical literature in reviewing the claim. Did you see anything indicating that?
A. No, I didn't see anything like that.
Q. Or that any person working on a claim looked on the Internet to gain information about injuries or diagnoses with respect to Ms. Belser. Did you see anything like that?
A. I did not.
Q. Nor did I see any indication that anybody working on the claim consulted with other people about the injuries. Did you see

anything indicating that?

A. Oh, yes. There's all -- there's several people involved in the file. And the only reason for them to be involved in the file after the vehicle was repaired is because of the injury claim.

Q. Okay. Let's flip back, and I'll ask you another question along those lines. Let me get you to turn to page 18, September 23rd, 2005, entry. Do you see the language, And move reserve to 15,000?

A. Yes.

Q. And this was done by Ms -- what's her last name again?

A. Hunter.

Q. Hunter.

A. I can find out what position she held at that time and let you know.

Q. And at this point in time, immediately above that, it indicates, BlueCross BlueShield subrogation amount was for a little over $7,300, correct?

A. Yes.

Q. All right. Let me get you to turn to page 21. You see there July 7th, 2006, BI negotiation for Belser?
A. Yes.
Q. All right. Can you tell me who made that entry?
A. Donald Lewis.
Q. Okay. And was Mr. Lewis free to determine that negotiation range on his own, or does this indicate that he obtained somebody's approval to do that?
A. He obtained someone's approval with regard to the authority request. If you'll look on the next page, this Brian Bennett, that BLB on 7/7/06, he says, Agreed with evaluation authority to settle. And, so, to answer your question, Mr. Lewis was free to evaluate the claim at whatever amount based on the information that he had that he felt was fair and accurate. That was then submitted to his manager, and we granted authority to settle the claim for that amount.
Q. And would Mr. Bennett have typically reviewed

the entire claim file in deciding if he was going to agree with Mr. Lewis's evaluation?

A. He could, but he doesn't have to. He can rely on the summary if he feels that that's adequate.

Q. Do we know if he reviewed the file in its entirety or relied on Mr. Lewis's evaluation in Ms. Belser's case?

A. I do not know that.

Q. Does this document, looking at page 22, indicate who came up with a negotiation plan?

A. That note is a continuation of the prior note that was entered by Mr. Lewis.

Q. Let's look at page 24. If you'll look under the September 12th, 2006, entry, about midways -- and that's the top entry, 9/12/06. About midways there, it says, Take reserves to 50,000 at this time. Do you see that language?

A. Yes.

Q. All right. And who made that entry?

A. Billy Causey.

Q. And who is Mr. Causey?

A. Billy Causey is a manager in the casualty unit.

Q. Okay. And in taking the reserves to 50,000, it was taking it to the policy limit, correct?

A. Yes.

Q. So, would it be fair to say that based upon information received up through September 12th, '06, Mr. Bennett -- I'm sorry -- Mr. Causey made a determination that Progressive may have to pay policy limits on this claim?

A. I think that that was based upon a conversation with you where, for the first time, Progressive was told that there's a wage loss which may exceed $10,000 and that there may be surgery necessary. And once that information was received, yes, he took the reserve to 50,000.

Q. Now, the surgery information, Progressive already had in its possession the report where one of the options was surgery, correct?

A. That report was in the file.
Q. Okay. And is it Progressive's contention that I said something other than what was included in that report about surgery?
A. I don't know. I'm looking at the face sheet note of September the 8th of '06 that was entered by Jerry Knight. This is summarizing the conversation with you -- let's see -- where you felt that the claim would have a value of 150,000.
Q. Now, do you see any entry in these claim notes where I supposedly mentioned surgery to somebody? The only entry I see --
A. I don't. I see that you felt like it had a value over 150. Maybe I just -- maybe I just thought that's what you were saying since you felt it had such a high value. I may have interpreted that.
Q. All right. So the two things you mentioned was I indicated there was roughly $10,000 in lost wages and the surgery issue came up. So the reserve jumped from 15,000 to 50,000 based on that, right?

A. Yes.

MR. BRADFORD: I think you also said that he thought it had a value of 150,000. I think he told you that.

A. Right.

Q. Did my opinion that the claim is valued at 150,000 cause y'all to move the reserve?

A. I think that it definitely was a consideration, because at that point it seemed like, hey, there's a lot of information out there that probably we don't have.

Q. And would y'all normally move a reserve just based on there might be something we don't have, or is the reserve based on what you do have?

A. It's based on both, but we now have -- we certainly know that $10,000 in wage loss is being claimed. We didn't know that. So that's a significant amount of money. And a claim that, hey, this has a value of $150,000 from an attorney, that carries some weight.

We need to pay attention to that. And it may make you think -- and I'm sure it did make us think -- there's probably other information out there we don't have. Because we're looking at this claim thinking that it's, you know, soft tissue injury.

Q. What happens if you set a reserve, say, at 15,000 and you end up having to pay $50,000? What's the consequence of setting the reserve too low?

A. There's not one.

Q. Y'all just sort of try and -- is the reserve sort of a budget that you try to budget by or something?

A. No, not at all. It's an amount of money that we set aside to pay claims in the future. And it needs to be an accurate number. It's for financial reasons so that insurance companies remain solvent and are able to report to insurance departments accurately what their pending claims are worth, how much money they have, how much money is set aside to pay claims.

Q. So the reserve is a requirement as an insurance company.
A. Yes.
Q. And I take it there could be some negative ramifications if you set reserves too low and you have a number of claims that are paid out more than what the reserve was disclosed at.
A. That's outside my experience. I don't know how that works with regulators, but it certainly makes sense that that's how it would be. I know that it's constantly emphasized to us in claims that reserves need to be accurate.
Q. Now, if Progressive determined that Ms. Belser was owed a certain sum of money that Progressive thought was reasonable on her claim, why wasn't the money sent to her?
A. Because we would have to have agreement with Ms. Belser that that amount of money is a fair and accurate settlement for her claim and we would expect to have a release signed.
Q. A release saying that Ms. Belser won't sue Progressive for anything related to the

claim?

A. Right. That we are settling this claim in its entirety and that she understands that and that this amount of money will be paid to her based upon that.

Q. So there's never a scenario where an insured owed money under a Progressive policy would simply be sent the money Progressive believes is owed on the claim without an insured signing a release; is that right?

MR. BRADFORD: You talking about under these type facts, right?

A. You're talking about an uninsured motorist claim, too, I assume.

Q. Yes.

A. You know, I've been in this business 20 years, and I've learned never to say never. And the way you phrased that question was never. I don't -- I can't think of one.

Q. Because -- and I guess let me ask this. Progressive accepted as a fact, when Mr. Lewis made his offer, that Ms. Belser should be paid $8,505 for the medical bills,

correct?

MR. BRADFORD: Object to the form.

Q. Is that true?

A. That was part of the evaluation was the amount of medical bills that was incurred; but, again, that was a global.

Q. Right. But, I mean, part of the global deal was Progressive acknowledged she should be paid that money, right?

A. Progressive acknowledged that she -- that we would pay her the amount of the offer in exchange for settling the case.

Q. Okay. And in making the offer, Progressive acknowledged in making the offer that it believed Ms. Belser was entitled to that money, correct?

A. Sure. That's why we made the offer.

Q. But the only way Progressive would send her money that Progressive believed she was entitled to was if she signed a release?

A. That's right. We have to reach an agreement.

MR. BLEVINS: Let me look through my stuff here and make sure I'm

finished.

(Brief pause)

Q. Do you know if Mr. Lewis is still employed with Progressive?

A. Yes, he is.

Q. Where is he located?

A. He's out of our Montgomery claims office.

Q. Is that over here off Carmichael Road?

A. If you say so. I'm terrible with things like numbers and street names.

MR. BRADFORD: It is.

A. It's behind Alex Holtsford's office. I can drive there, but I can't tell you the address.

Q. Is there a written policy or procedure or memorandum or some directive that notifies adjusters they should not pay money to insureds that Progressive believes is owed to an insured without a signed release from the insured?

A. I can't think of anything that fits that bill.

Q. Are the adjusters trained not to do that?

A. The adjusters are trained that in order to settle an uninsured motorist claim, that they will pay a global amount to settle the claim in exchange for a release.

Q. And they're further trained that if an insured refuses to sign a release, do not pay the money?

A. That's right.

Q. And that training was in place back in October 2004 through the present date?

A. Yes. And that's just with regard to an uninsured motorist claim. I mean, there are other types of coverage that have nothing to do with -- with that, where no release would be obtained. Let's take med pay, for example.

MR. BLEVINS: Okay. Larry, did you have luck looking for those other documents you said you had?

MR. BRADFORD: They're in my car. I can go get them right now if you want me to.

MR. BLEVINS: Yeah, if you could, so I

can make sure there's nothing I need to ask on those.

(Brief pause)

MR. BRADFORD: What happened, we produced something in a prior case, so the Bates won't be right, but that will be just like a prior version of what we already gave you. I don't think there's anything different about it, but it is what it is.

MR. BLEVINS: You mean Progressive has been sued before?

MR. BRADFORD: Yeah. Yeah, yeah.

MR. BLEVINS: Okay. Just one or two final questions.

Q. When Mr. Lewis determined the range of negotiation that we talked about previously that Mr. Bennett approved, was there some set guidelines or standards or something to assist Mr. Lewis in determining that range, or did he just arbitrarily and subjectively determine it?

A. It is determined just based upon his review of all the information contained in the claim file.

MR. BRADFORD: There's no guidelines?

A. That's no other guidelines.

Q. And I know we've covered this, but I don't know if I asked this question in this manner. Since we had questions about injuries, certain injuries, whether they were pre-existing and so on, was there any reason you can point to as to why Progressive would not communicate with treating physicians and pose those questions other than Progressive didn't think it was required or needed?

A. No. I think that's it. I don't think that -- the medical records that we have, I don't believe we felt that it required further explanation at that point.

MR. BRADFORD: That's your two, man.

MR. BLEVINS: Give me a minute here. I've got a question if I can get it together.

(Brief pause)

Q. You know, that approach seems, to me, to be an approach Progressive would take to be able to claim this subjective idea that certain injuries were pre-existing as opposed to finding an answer through an individual, such as a physician, who could give an answer based on training and experience. Is the reason Progressive doesn't ask these type questions to treating physicians because it may expose Progressive to having to pay more money on a claim?

A. No.

Q. Okay. And does Progressive recognize that a physician, a treating physician could most likely answer those questions?

A. Yes.

MR. BRADFORD: And when you say those questions, you're talking about something like pre-existing, that type of thing?

Q. Right. Pre-existing questions, the severity of an injury, what a diagnosis means, things of that nature. A physician would be

qualified to answer those type questions?
A. Yes.
Q. And is Progressive's position that in fairly evaluating Ms. Belser's claim, Progressive saw no need to ask any of her treating physicians any questions along those lines?
A. That's correct.

MR. BLEVINS: Okay. That will do it.

MR. BRADFORD: Let's rock and roll.

(The deposition concluded at 12:37 p.m.)

* * * * * * * * * * *

FURTHER DEPONENT SAITH NOT

* * * * * * * * * * *

REPORTER'S CERTIFICATE

STATE OF ALABAMA

MONTGOMERY COUNTY

I, Mallory M. Johnson, Court Reporter and Commissioner for the State of Alabama at Large, hereby certify that on Friday, April 6, 2007, I reported the deposition of LARRY DAVID LACKEY, who was first duly sworn or affirmed to speak the truth in the matter of the foregoing cause, and that pages 4 through 135 contain a true and accurate transcription of the examination of said witness by counsel for the parties set out herein.

I further certify that I am neither of kin nor of counsel to any of the parties to said cause, nor in any manner interested in the results thereof.

This 4th day of May, 2007.

MALLORY M. JOHNSON, COURT REPORTER
And Commissioner for the
State of Alabama at Large

MY COMMISSION EXPIRES: 2/24/09